## OCEAN SPRAY CRANBERRIES, INC. *vs.* MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION & another.[1]

Suffolk. January 8, 2004. - May 12, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Anti-Discrimination Law,* Employment, Handicap, Damages. *Employment,* Discrimination. *Handicapped Persons. Damages,* Under anti-discrimination law. *Limitations, Statute of. Massachusetts Commission Against Discrimination.*

This court concluded that the Massachusetts Commission Against Discrimination, in deciding that an employer failed to provide a reasonable accommodation to a handicapped employee in violation of G. L. c. 151B, § 4, correctly ruled that sufficient evidence existed to prove that the employee's vision impairment after implant surgery substantially limited a major life activity, that is, his ability to work, where the employee's increased difficulty seeing small parts of machinery restricted his ability to perform a class of jobs, namely, equipment maintenance in manufacturing plants. [636-641]

In the context of an action alleging that an employer failed to provide a reasonable accommodation to a handicapped employee in violation of G. L. c. 151B, § 4, this court concluded that when an employer responds to a request for such an accommodation with equivocal action or inaction, the limitations period in G. L. c. 151B, § 5, begins to run at the point thereafter when the employee knew or reasonably should have been aware that the employer was unlikely to afford him or her a reasonable accommodation [641-646]; therefore, where there was no basis in the record in a proceeding before the Massachusetts Commission Against Discrimination to support the conclusion that a handicapped employee did not know or should not reasonably have been aware that his employer was not going to accommodate a reasonable request that the employee had made prior to taking medical leave from work, a claim based on that failure to accommodate was time barred, but evidence of the employer's responses or inaction to that request was relevant as background evidence in relation to a later claim that was not time barred [646-647].

In a civil action arising from a decision of the Massachusetts Commission Against Discrimination (commission) that an employer failed to provide a reasonable accommodation to a handicapped employee in violation of G. L. c. 151B, § 4, sufficient evidence existed to support a hearing commissioner's findings that, under the circumstances, the employee was entitled to request a reasonable accommodation; that the employer did not

[1] Richard Rapoza.

engage in the required interactive process to determine an appropriate accommodation; and that the employee made a timely request for accommodation [648-650]; however, because the plaintiff could not recover damages for time-barred events, this court remanded the case to the commission for further proceedings with regard to the assessment of damages [650-651].

CIVIL ACTION commenced in the Superior Court Department on November 2, 2001.

The case was heard by *Judith Fabricant,* J., on a motion for judgment on the pleadings.

The Supreme Judicial Court granted an application for direct appellate review.

*Kay H. Hodge* for the plaintiff.

*Michael M. Kramer* for Richard Rapoza.

*Steven S. Locke (Wendy A. Cassidy* with him) for Massachusetts Commission Against Discrimination.

CORDY, J. This case requires us to decide whether and how the "continuing violation" doctrine applies to an action alleging that an employer failed to provide a reasonable accommodation to a handicapped employee in violation of G. L. c. 151B, § 4.

1. *Procedural history.* On September 15, 1995, Richard Rapoza filed charges of discrimination against his former employer, Ocean Spray Cranberries, Inc. (Ocean Spray), with the Massachusetts Commission Against Discrimination (MCAD or commission). The charges included an allegation that Ocean Spray failed to accommodate Rapoza's impaired vision despite his requests for accommodation beginning in May, 1993. The commission found probable cause to credit some of Rapoza's allegations and certified the case for a public hearing.[2]

A commissioner conducted the hearing over four days in April and June, 1997, after which he issued a written decision

---

[2]Rapoza also alleged that Ocean Spray failed to accommodate his cardiac condition, and that it discriminated against him on the grounds of handicap and age when it terminated his employment. The commission did not find probable cause to credit Rapoza's claim of age discrimination, and after a public hearing, a commissioner rejected Rapoza's other claims, concluding that Rapoza did not require or ask for accommodation for his heart condition and that Ocean Spray's decision to terminate Rapoza was lawful and unrelated to his handicap. Rapoza did not appeal from these findings.

including detailed findings of fact and conclusions of law. He concluded that Rapoza's impaired vision qualified him as a "handicapped person" under G. L. c. 151B, §§ 1 and 4, and that Ocean Spray had failed to accommodate his handicap, "completely disregard[ing his] requests for help." The commissioner awarded Rapoza $50,000 for emotional distress incurred from the time he first requested accommodation in May, 1993, until his termination from Ocean Spray in June, 1995. The commissioner also ordered Ocean Spray to design an antidiscrimination policy and implementation plan, and to retain a commission-approved antidiscrimination trainer.

Ocean Spray appealed from the commissioner's decision to the commission, arguing that Rapoza's complaint was not filed timely and that he was not a "handicapped person." The commission affirmed the commissioner's order, concluding that Rapoza's complaint was timely under the "continuing violation doctrine," and that Rapoza's visual impairment substantially limited both his ability to see and his ability to work, thus qualifying him as a "handicapped person."[3]

Pursuant to G. L. c. 30A, § 14, Ocean Spray appealed from the commission's decision to the Superior Court, where it was affirmed in all respects except with regard to its remedial order. The Superior Court judge concluded that the order requiring Ocean Spray to develop an antidiscrimination policy and to hire a trainer was not reasonably tailored to the violations found and therefore constituted an abuse of discretion. After the judge modified the order accordingly, Ocean Spray appealed, and we granted its petition for direct appellate review. We remand the case to the commission for a recalculation of damages incurred by Rapoza within the six-month period preceding the filing of his charge of discrimination with the commission.

2. *Background.* The hearing commissioner found the following facts. Ocean Spray employed Rapoza from 1987 until 1995.

---

[3]The commission initially released an order that included a footnote stating: "Given our conclusion that [Rapoza] is not a 'handicapped person' as defined under G. L. c. 151B, we do not reach [other] alleged errors of law." This footnote plainly contradicts the conclusion in the text that Rapoza *is* a handicapped person. Ocean Spray sought reconsideration in light of this inconsistency, and the full commission issued an amended order that is identical to its initial order without the offending footnote.

For most of that time, Rapoza worked as a maintenance mechanic in the "brik pak" department,[4] performing repairs on very small parts inside certain machinery in poorly lit areas of the plant.

For most of his lifetime, Rapoza had no vision in his left eye as the result of a childhood accident. In March, 1992, Rapoza underwent lens implant surgery, which restored vision in his left eye somewhat, but left him with a depth perception problem that caused him to have difficulties seeing small objects. This vision problem made it difficult for Rapoza to work with small machine parts and affected his performance at work.

Rapoza discussed his vision problem and its impact on his performance with his direct supervisor, Dan Kanaley, on several occasions beginning in May, 1993. During one such discussion, Rapoza specifically requested more lighting in the brik pak area, but no additional lighting materialized. Kanaley asked Rapoza to provide written documentation of his vision problem, and Rapoza complied by submitting a letter from his eye doctor to Ocean Spray's human resources manager, Barbara Denker, on June 17, 1993. The letter stated that Rapoza "has difficulties with depth perception" that may cause "difficulties with fine tolerance measurements and close work"; additionally the letter requested "[a]ny help you are able to provide for him in modifying his workplace . . . ." In subsequent conversations with Kanaley and Denker, Rapoza suggested that he might work in a different area of the plant, where the parts were larger and therefore easier for him to see.[5] Nothing came of this suggestion.

In November, 1994, one and one-half years after first seeking some accommodation for his impaired vision, Rapoza left work to undergo heart surgery. Both during his recovery period and after returning to work in April, 1995, Rapoza provided Denker

---

[4] The "brik pak" department is the section of Ocean Spray's manufacturing facility that produces cardboard juice boxes and affixes straws to those containers.

[5] The hearing commissioner's opinion clearly states that Rapoza suggested that he move to a different area of the plant, but does not state precisely to whom he made this request. However, at the hearing, Denker admitted that Rapoza indicated to her "some interest [in] maybe another area in another part of the facility." Additionally, Rapoza testified that he made such a request to Kanaley.

with letters from doctors referring to his vision problems. The first, a letter from Rapoza's psychologist dated March 29, 1995, explained that Rapoza would not be able to return to work before April 17 and described Rapoza as "exhibiting physical and psychological characteristics of an Adjustment Disorder with Anxiety and Depressed Mood" as a result of the "pressures, demands and requirements of his job where the performance and effectiveness expected of him exceed the physical capabilities placed on him as a result of his limited vision in his left eye." The psychologist's letter also included a copy of the June 17, 1993, letter from Rapoza's eye doctor. Rapoza's cardiologist supplied a second letter, dated April 14, 1995. That letter indicated that Rapoza's vision problem was causing "considerable stress which could aggravate his cardiac status" and recommended "that he function in an environment where this physical limitation would be minimally aggravating." Finally, in response to another Ocean Spray request for an update on his vision problem, Rapoza submitted a letter from his eye doctor dated May 17, 1995, stating that he "has limited depth perception and difficulties with close work" and again requesting "[a]ny help which you could provide him in modifying his work place . . . ." Ocean Spray took no action in response to any of these letters, and subsequently terminated Rapoza's employment on June 22, 1995, for falsifying his time card.

3. *Discussion.* We will "affirm a decision and order of the MCAD unless the findings and conclusions are unsupported by substantial evidence or based on an error of law." *Ramsdell* v. *Western Mass. Bus Lines, Inc.,* 415 Mass. 673, 676 (1993). We first discuss whether Rapoza's physical impairment qualified him as a handicapped person, then assess whether the "continuing violation" doctrine brought Rapoza's action within the statute of limitations, and finally, address whether Ocean Spray met its obligation of reasonable accommodation.

a. *"Handicap."* General Laws c. 151B, § 4 (16), prohibits discrimination against "a qualified handicapped person." The statute defines a "handicapped person" as "any person who has a handicap," G. L. c. 151B, § 1 (19), and in turn defines a "handicap" as: "(*a*) a physical or mental impairment which

*substantially limits one or more major life activities* of a person; (*b*) a record of having such impairment; or (*c*) being regarded as having such impairment" (emphasis added). G. L. c. 151B, § 1 (17). "[M]ajor life activities" are "functions, including, but not limited to, . . . seeing . . . and working." G. L. c. 151B, § 1 (20).

"The statute draws a distinction between persons who have a physical or mental impairment, and those whose impairment 'substantially limits' a 'major life' activity. . . . Only the latter are protected by the Massachusetts statute." *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 237 (2001). Ocean Spray contends that the commissioner and the commission erred when they determined that Rapoza's vision impairment substantially limited a major life activity. "Our review is limited to determining whether the commissioner's findings and conclusions were supported by substantial evidence, and whether there was an error of law." *College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 170 (1987), citing G. L. c. 151B, § 6, and G. L. c. 30A, § 14 (7).

General Laws c. 151B anticipates that determining whether a person is a "handicapped person" will be an individualized inquiry. See G. L. c. 151B, § 1 (17) (defining "handicap" as "physical or mental impairment which substantially limits one or more major life activities *of a person*" [emphasis added]). Accord *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 483 (1999) ("whether a person has a disability under the [Americans with Disabilities Act] is an individualized inquiry")[6]; Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § II.A.6 (1998) (MCAD Guidelines) ("determination of whether an impairment substantially limits a major life activity depends on the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment"). As such, per se rules are to be avoided.

---

[6]Federal legislation uses the term "disability" rather than the term "handicap." This difference merely reflects a change in currently acceptable terminology and implies no substantive difference. See *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 236 n.7 (2001).

In this case, Rapoza has asserted that he is handicapped because problems with his vision substantially limit two major life activities: working and seeing. See G. L. c. 151B, § 1 (20). Notwithstanding that Rapoza himself, the commission, and the judge in the Superior Court who affirmed the commission's decision all combined and conflated the "working" and the "seeing" claims, each claim is separate and distinct, and must be assessed independently of the other.[7] See *New Bedford* v. *Massachusetts Comm'n Against Discrimination,* 440 Mass. 450, 464, 466 (2003) (examining "working" separately from major life activity of "thinking"). See also, e.g., *Fraser* v. *Goodale,* 342 F.3d 1032, 1041 (9th Cir. 2003), cert. denied sub nom. *United States Bancorp* v. *Fraser,* 124 S. Ct. 1663 (2004) (addressing each life activity "in turn" for claim under the Americans with Disabilities Act); *Steele* v. *Thiokol Corp.,* 241 F.3d 1248, 1253 (10th Cir. 2001) (same). We turn first to the more narrow claim of "working."

Rapoza has suffered a visual impairment since his early teens, when he was shot in the left eye with a BB gun. The accident left him with no functional vision in that eye. The fact that he had monocular vision, however, did not form the basis of his claim to be "handicapped." That charge stems from the effects of intraocular lens implant surgery that Rapoza underwent in 1992, when he was fifty-two years old. At that time he had been working at Ocean Spray for five years. While the operation restored partial vision to Rapoza's left eye, it left him with a problem of depth perception. The entire thrust of Rapoza's sole surviving claim is that the 1992 eye surgery triggered his *legal* handicap.

To prevail on his claim that his postsurgery visual impair-

---

[7]Neither the commission nor the judge examined the two major life activities separately, as the law commands. Rather, both the commission and the judge focused exclusively on Rapoza's difficulties at work. Thus, the commission concluded that Rapoza was "a handicapped person based on his impaired vision" as evidenced by his "extreme difficulty in performing his job because of his difficulty seeing small parts, and his problems with depth perception." It further held that Rapoza's vision impairment substantially limited him "from performing his job" because without reasonable accommodation he could not do so "in a manner not experienced by the average person." The judge, in turn, stating only that she had "reviewed the entire evidentiary record" (which itself focused almost exclusively on Rapoza's work life), agreed that Rapoza was "substantially limited [in] the major life activity of seeing."

ment became a legal handicap due to its impact on his ability to work, it was Rapoza's burden to establish that his daily activity of working was substantially limited after his surgery. See, e.g., *Dube* v. *Middlesex Corp.*, 59 Mass. App. Ct. 734, 737-738 (2003) (plaintiff left with permanent arm impairment after accident not "handicapped" within meaning of G. L. c. 151B, § 1 [17]).

Both the MCAD and Equal Employment Opportunity Commission agree that an impairment substantially limits an individual's ability to work "if it prevents or significantly restricts the individual from performing a class of jobs or a broad range of jobs in various classes." MCAD Guidelines, *supra* at § II.A.6. 29 C.F.R. § 1630.2(j)(3)(i) (2003). We recently clarified this standard in *New Bedford* v. *Massachusetts Comm'n Against Discrimination*, *supra* at 466, where we ruled that, consistent with the MCAD Guidelines and with Federal precedent, the fact that an individual is unable to perform "only a particular aspect" of a "single, particular job" is not sufficient to satisfy the "substantial limitation" requirement of our antidiscrimination statute. *Id.*[8]

Under this standard, we conclude that the commission was correct to rule that the evidence was sufficient to prove that Rapoza's vision impairment after the implant surgery substantially limited his ability to work. At the time he was terminated,[9] Rapoza had worked as an equipment maintenance operator at Ocean Spray and at his previous employer for a total of more than thirty years. During his first few years at Ocean Spray, Rapoza was assigned to general equipment maintenance, which meant he performed maintenance on machinery throughout the plant. At his request he was then assigned exclusively to maintaining machinery in the brik pak department, where he remained for the next three years.

---

[8]Neither the commission nor the Superior Court judge had the benefit of our decision in *New Bedford* v. *Massachusetts Comm'n Against Discrimination*, 440 Mass. 450, 466 (2003). Indeed, the commission expressly rejected the analysis that we adopted in the *New Bedford* case, stating: "Under Federal law, the impairment must substantially limit [Rapoza's] employment in general, not merely the particular job he may wish to hold. . . . We specifically reject such a narrow reading of G. L. c. 151B."

[9]It is not disputed that the reason for Rapoza's termination had nothing to do with his ability or inability to maintain Ocean Spray's equipment.

Rapoza testified that, while working in that department, he began to experience problems, especially in working on the "filler" machine where he "struggled" with its "real fine and close work." Certainly, Rapoza's testimony that he "couldn't focus properly" and "couldn't see what [he] was doing" when working on the filler machine is evidence that he was substantially limited at least in his ability to perform the particular job of an equipment maintenance mechanic in the brik pak department. But, as we explained in *New Bedford* v. *Massachusetts Comm'n Against Discrimination, supra,* Rapoza's inability to perform a "single, particular job" does not suffice to establish that he is substantially limited in the major life activity of working. The evidence must show instead that he is substantially limited in a "class of jobs," such as equipment maintenance in manufacturing plants. This is the "class of jobs" for which he is trained and experienced in performing.

As to that, there is evidence to the effect that all of Ocean Spray's equipment maintenance mechanics were required to do some fine detail work. Two Ocean Spray managers testified that equipment maintenance throughout the plant involved small parts and fine tolerance work because the plant's machinery was becoming increasingly electronic and computerized.

Moreover, the evidence of the plant's increasing technological sophistication strongly suggests that Rapoza would have had substantial difficulty working as an equipment maintenance mechanic for Ocean Spray in any other part of its plant. There is nothing in the record to suggest that the deterioration in depth perception that attended Rapoza's implant surgery is temporary. And there is every reason to conclude that Ocean Spray fully recognized that, if Rapoza could not perform equipment maintenance work in the brik pak department, he would have no better success as an equipment maintenance worker anywhere else in its plant. Rapoza testified that his supervisor told him, "[Y]ou're either going to make it here or you're not going to make it anywhere." Last, it is unlikely that the job demands on a machine maintenance mechanic created by the "computerization" of Ocean Spray's plant machinery is atypical of the job demands on such employees in comparable manufacturing plants.

The commission concluded that Rapoza's visual impairment substantially limited his ability to perform "any line of work that would require him to see and use small parts." The commission's finding is supported by the record, and Rapoza's increased difficulty seeing small parts of machinery would substantially restrict his ability to perform a class of jobs, namely equipment maintenance in manufacturing plants. Contrast *New Bedford* v. *Massachusetts Comm'n Against Discrimination, supra* (police officer not reinstated to SWAT teams after leave of absence was not substantially limited in major life activity of working).[10]

b. *Limitations period.* At the time Rapoza filed his charge of discrimination, G. L. c. 151B, § 5, as amended through St. 1989, c. 722, § 29, provided: "Any complaint filed pursuant to this section must be so filed within six months after the alleged act of discrimination."[11] Ocean Spray contends that any alleged acts of discrimination occurring prior to March 15, 1995 (six months prior to the filing of the complaint with the commission) are barred by this statute, and that the alleged acts of discrimination occurring after that date do not constitute a failure to provide reasonable accommodation.

By the plain language of the statute, the limitations period begins to run at the time of the "act of discrimination." In some instances, the precise moment of the "act of discrimination" is easy to calculate: plainly, if an employee is denied a promotion on an improper basis, the date of the "act of discrimination" is the date of that denial. See, e.g., *Dubose* v. *Massachusetts Bay Transp. Auth.*, 25 Mass. Discrimination L. Rep. 336 (2003) (limitations period in denial of promotion case began to run when complainant learned of decision not to promote her). In some instances, typically those in which the improper conduct continues or evolves over a course of time, the date of the "act of discrimination" is more difficult to determine. Pursuant to its statutory authority under G. L. c. 151B, § 3 (5), to "adopt,

---

[10]Because we conclude that Rapoza's impairment substantially limited the major life activity of working, we need not address whether his impairment also substantially limited the major life activity of seeing.

[11]In 2002, the Legislature amended G. L. c. 151B, § 5, extending the limitations period from six months to 300 days. St. 2002, c. 223, § 1.

promulgate, amend, and rescind rules and regulations suitable to carry out the provisions" of G. L. c. 151B, the commission has provided regulatory guidance for such situations.

Specifically, the commission has adopted an exception to the six-month limitations period for so-called "continuing violations." This exception, 804 Code Mass. Regs. § 1.03(2), as in effect at the time of Rapoza's filing,[12] provided:

> "The complaint may be filed . . . at any time within six months after the alleged unlawful conduct; provided, however, that the six month requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature . . . ."

This exception for violations of a continuing nature "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 (2001).[13]

As the commission states in its order, for the continuing violation doctrine to apply,[14] a complainant must ordinarily

---

[12]The current regulatory exception for continuing violations appears at 804 Code Mass. Regs. § 1.10(2) (2002).

[13]In *Rock* v. *Massachusetts Comm'n Against Discrimination*, 384 Mass. 198, 208 (1981), we held that the continuing violation rule was facially valid and found "no literal or functional inconsistency between the rule and the statute." However, we explicitly noted that "the application of the rule to particular facts may prove difficult." *Id.* Indeed, commentators have labeled the continuing violation doctrine the "most muddled area in all of employment discrimination law," 2 B. Lindemann & P. Grossman, Employment Discrimination Law 1351 (3d ed. 1996), and the "subject of judicial and academic consternation," The Supreme Court, 2001 Term, Leading Cases, 116 Harv. L. Rev. 352, 356 (2002).

[14]Both Federal decisions and the commission distinguish between two different varieties of continuing violations: "systemic" and "serial." A systemic violation is "the maintenance of a general practice or policy aimed at members of a protected class of employees." *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531-532 n.12 (2001), citing *Provencher* v. *CVS Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 14 (1st Cir. 1998). By contrast, a serial violation "is comprised of an interlinked succession of related events, stemming from a common discriminatory animus, with at least one act of harassment occurring within the limitations period." *Cuddyer* v. *Stop & Shop Supermarket Co.*, *supra* at 531, citing *Mack* v. *Great Atl. & Pac. Tea Co.*, 871

prove that "(1) at least one discriminatory act occurred within the six month limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts . . . [and] (3) earlier violations outside the six-month limitations period did not trigger [Rapoza's] 'awareness and duty' to assert his rights, i.e., that [Rapoza] could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory."[15]

Applying this standard, the commission found that Ocean Spray's failure to accommodate Rapoza was subject to the continuing violation exception because at least one discriminatory act had occurred after his return to work in April, 1995, and there was a substantial relationship between that discriminatory act and others that had occurred between May, 1993, when Rapoza first sought an accommodation, and November, 1994, when he took his medical leave. The commission went on to hold that the third requirement of the continuing violation exception (that Rapoza could not have formed a reasonable belief that the prior actions were discriminatory) was inapplicable. The commission reasoned: "[Rapoza] alleged that he made several requests for an accommodation, and that . . . Ocean Spray continuously denied his requests from April 1993 through June 1995. In such circumstances, we conclude that the 'reasonable awareness' standard is inapplicable because a new violation is deemed to occur each day [Rapoza] was unlawfully denied an accommodation." Under this "each day" theory, the commission argues here that the failure to make a reasonable accommodation is an act of discrimination that recurs each day that the employer fails to provide that accommodation.[16] See *Butler vs. Henderson*, E.E.O.C. No. 01986984 (Aug. 26, 1999). We

F.2d 179, 183 (1st Cir. 1989). As the commission correctly concluded, this is not a systemic violation case, because there has been no allegation that Ocean Spray had a policy or practice of denying employees accommodation.

[15]See *Desrosiers* v. *Great Atl. & Pac. Tea Co.*, 885 F. Supp. 308, 312 (D. Mass. 1995).

[16]Although the commission contended in its brief and in oral argument that the "each day" language in its decision should be construed this broadly, its decision could be read more narrowly, merely to state that on each day that Ocean Spray denied a request for accommodation, it committed a new violation. While we agree that each request and denial constitutes a new violation, we fail to see why viewing the requests and denials as a series of viola-

reject the commission's "each day" construct, and conclude that any proved discrimination occurring prior to March, 1995, is time barred for liability and damage recovery purposes.

"[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002), quoting *Taylor* v. *Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), cert. denied, 519 U.S. 1029 (1996). Accord MCAD Guidelines, *supra* at § II.C. The refusal of an employer to participate in that process once initiated, or to make a reasonable accommodation once it has been identified, is a violation of our discrimination laws. Under the commission's "each day" theory, an employer would be deemed to have committed a new act of discrimination against the employee every day thereafter (thereby restarting the limitations clock) until it reversed its position and, ultimately, provided the accommodation. Under this theory, an employee could file a "timely" complaint today alleging that her employer denied her an accommodation requested decades ago, even if she had neither mentioned nor renewed her request in the intervening years.[17] Such an outcome would directly contravene the purposes of the limitations requirement, namely, "(1) to provide the MCAD with an opportunity to investigate and conciliate the claim of discrimination; and (2) to provide notice to the defendant of potential liability." *Cuddyer* v. *Stop & Shop Supermarket Co., supra* at 531.

Looked at from another perspective, if the commission's "each day" theory is a viable way of identifying continuing acts of discrimination, nothing in principle distinguishes any

---

tions renders the third requirement of the continuing violation doctrine inapplicable. Although each new denial constitutes a separate violation and triggers a new limitations period, a complainant may not assert previous violations outside the limitations period if, at the time of the earlier violations, the complainant knew or could have formed a reasonable belief that the earlier violations were discriminatory.

[17]The "each day" construct would therefore render the first two requirements of the continuing violation doctrine — an act within the limitations period and substantial relationship to the timely act — wholly meaningless. There would be no need to tie untimely acts to related timely acts, because every claim of failure to accommodate would be dated on the last day on which the employee worked for the employer without accommodation.

discrete act of discrimination from a continuing violation. For example, the "act of discrimination" that occurs when an employer improperly denies an employee a promotion could be characterized as the refusal, every day after the denial, to give the employee the additional responsibilities and benefits that would have accompanied the promotion. Similarly, a refusal to hire or a decision to terminate could also be recharacterized as unlawfully denying the employee a job "each day" thereafter. This would eviscerate the purpose of a statutory limitations period, and permit what should be a limited exception to such a stricture to swallow it whole. When an employer refuses an employee's request for a reasonable accommodation, the refusal is a discrete discriminatory act triggering the statutory limitations period.

There remains, however, a practical problem that must be addressed regarding the precise moment when the statute begins to run. While an explicit refusal by an employer to accommodate (or to engage at all in the interactive process) presents the easy case, the harder case is presented when the employer takes equivocal action or, as the commissioner found occurred here, simply takes no action at all. In such circumstances, employees cannot be expected to come forward with a claim of discrimination until they are able to appreciate that the requests will not be accommodated, and an act of discrimination has occurred. Consequently, the employee must be allowed some time after making a request for an accommodation to await action from the employer and to assess whether such action has been adequately forthcoming. That time period cannot go on indefinitely, or it would render the limitations period wholly ineffectual as well. We conclude that, when an employer responds to a request for a reasonable accommodation with equivocal action or inaction, the limitations period in G. L. c. 151B, § 5, begins to run at the point thereafter when the employee knew or reasonably should have been aware that the employer was unlikely to afford him a reasonable accommodation.[18] This formulation is similar in substance to

[18]Our decision in *Lynn Teachers Union, Local 1037* v. *Massachusetts Comm'n Against Discrimination*, 406 Mass. 515 (1990), is not to the contrary. That case arose because the school committee of Lynn had a rule in the

the third requirement of the continuing violation rule, which the commission determined not to apply in this case: that is, whether the employer's actions (or inactions) were sufficient either to make the complainant aware of the discrimination, or to enable him to form a reasonable belief thereof. It is also consistent with the rule we apply in tort cases concerning when the statutorily provided three-year limitations period begins to run. See, e.g., *Olsen* v. *Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983) ("cause of action [for negligence resulting in an insidious occupational disease] did not accrue before [plaintiff] knew or should reasonably have known that he had contracted [the disease] as a result of conduct of the defendants"); *Franklin* v. *Albert*, 381 Mass. 611, 612 (1980) ("cause of action for medical malpractice does not 'accrue' . . . until a patient learns, or reasonably should have learned, that he has been harmed as a result of a defendant's conduct").

Applying this standard to the facts as found by the commissioner, there is no basis in the record to support the conclusion that Rapoza did not know or should not reasonably have been

---

1960's and 1970's requiring teachers to resign if they became pregnant. *Id.* at 517. Several teachers who had become pregnant, had been forced to resign, and subsequently had returned to teaching challenged their union's seniority system, *id.* at 517-518, which gave credit only for "consecutive years" of experience teaching in Lynn, *id.* at 518. The teachers who had been forced to resign during pregnancy lost seniority credit for all of the years that they taught before being forced to resign. *Id.* We upheld the commission's application of the continuing violation doctrine, reasoning that a "seniority system which is so 'facially neutral' that it ignores prior discriminatory acts against its members, to the detriment of those members, presents a ready vehicle for application of the continuing violation rule." *Id.* at 522. Specifically, we held that the "refusal to credit" teachers with their preresignation seniority was a continuing act of discrimination. *Id.* at 522-523. The crucial difference between the "refusal to credit" at issue in the *Lynn Teachers Union* case and the "refusal to accommodate" at issue in this case is that the "refusal to credit" was the union's generally applicable, system-wide policy, while a refusal to accommodate is, necessarily, a determination made on a case-by-case basis. There, we saw the incorporation of a prior discriminatory rule into an existing *system* as "breath[ing] new life" into a prior illegal system. *Id.* at 523. When an employer engages in systemic discrimination, the "true character and enormity of the discriminatory environment" can only be understood by examining the continuing system as a whole. *Cuddyer* v. *Stop & Shop Supermarket Co., supra* at 538. Hence, the reasoning of the *Lynn Teachers Union* case is inapplicable to discrete acts of discrimination against a specific individual.

aware that his request was not going to be accommodated. To the contrary, the commissioner found that no one at Ocean Spray ever offered Rapoza any suggestions for helping him with his work in the brik pak area after he requested an accommodation in May, 1993. Rapoza also testified that his request to be transferred to another area of the plant was twice met with the statement from his supervisor that "you're either going to make it here or you're not going to make it." Indeed, the commissioner found that Ocean Spray "completely disregarded [Rapoza's] requests for help[,] . . . extended no response at all to [Rapoza's] requests, and failed to give any explanations for its failure to do so." In these circumstances, Rapoza was on adequate notice that his request was not going to be accommodated at least by the time he left for heart surgery in November, 1994. The six-month limitations period for Ocean Spray's failure to accommodate a request first made in May, 1993, expired long before Rapoza filed his charge of discrimination on September 15, 1995.

Our conclusion that the limitations period has run for this earlier failure to accommodate does not, of course, make those events irrelevant. We have held in the hostile work environment context that a "plaintiff who has a seasonable claim may use events that occurred prior to the six-month limitation period as background evidence . . . even though she cannot recover damages for the time-barred events." *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 530 n.10 (2001), citing *Sabree* v. *United Bhd. of Carpenters & Joiners, Local No. 33*, 921 F.2d 396, 400 n.9 (1st Cir. 1990). Similarly, evidence of an employer's previous responses or inaction to an employee's request for accommodation is relevant as background evidence to determine whether subsequent actions by the employee should be understood as requests for accommodation, and whether the employer's response to a subsequent request meets the "employer's obligation to participate in the interactive process." *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002), quoting *Taylor* v. *Principal Fin. Group, Inc.*, 98 F.3d 155, 165 (5th Cir. 1996). Thus, in evaluating whether Ocean Spray failed to accommodate Rapoza in 1995, what occurred in response to his time-barred request for accommodation is relevant.

*c. Reasonable accommodation.* Having determined that the protections of G. L. c. 151B extend to Rapoza, we must assess whether Ocean Spray "discriminate[d] against" Rapoza because of his handicap. See G. L. c. 151B, § 4 (16). Because we have concluded that any requests for accommodation that Rapoza might have made before leaving work for heart surgery in November, 1994, are time barred, our analysis is limited to requests for accommodation made after November, 1994.

As a preliminary matter, we reject Ocean Spray's contention that the fact that Rapoza had been performing his job without accommodation conclusively demonstrates that he needed no accommodation. The MCAD Guidelines, *supra* at § II.C, define a "reasonable accommodation" as "any adjustment or modification to a job (or the way a job is done), employment practice, or work environment that makes it possible for a handicapped individual to perform the essential functions of the position involved *and to enjoy equal terms, conditions and benefits of employment*" (emphasis added).[19] Although Rapoza may have been able to perform the essential functions of his position without accommodation (albeit with great difficulty), he was not able to do so under equal terms and conditions. Because of his handicap and the unmitigated condition of his work environment, Rapoza took significantly longer to do his repair work, and worked under "considerable stress" that posed a specific and significant risk to his cardiac status. In these circumstances, Rapoza was entitled to request a reasonable accommodation and his employer was "obligat[ed] to participate in the interactive

[19]This definition is in accord with the statutory framework set out in G. L. c. 151B. Section 4 (16) makes it an unlawful practice to "otherwise discriminate" against a qualified handicapped individual. Chapter 151B provides no definition for "discriminate." However, elsewhere in § 4, the statute prohibits discrimination "in terms, conditions or privileges of employment," indicating that providing unequal employment terms, conditions, or privileges constitutes discrimination. See G. L. c. 151B, § 4 (1). When a qualified handicapped individual's disability permits him to perform the essential functions of a job without accommodation but prevents him from doing enjoying equal terms, conditions, and benefits of employment, the failure to provide a reasonable accommodation constitutes discrimination under § 4 (16). Cf. 29 C.F.R. § 1630.4(i) (2003) (Equal Employment Opportunity Commission prohibits discrimination in regard to any "term, condition, or privilege of employment").

process of determining one." *Russell* v. *Cooley Dickinson Hosp., Inc., supra* at 457.[20]

The commissioner's finding that Ocean Spray did not engage in the interactive process to determine an appropriate accommodation is supported by the evidence, and the only issue remaining, therefore, is whether Rapoza requested accommodation after November, 1994. We find substantial evidence that Rapoza made such a request.[21]

Viewed separately, the three letters that Rapoza submitted to Denker, dated March 29, April 14, and May 17, 1995, might not constitute an adequate request for accommodation. Taken together, and with the backdrop of ignored requests for more

[20]Our opinion in *Tate* v. *Department of Mental Health*, 419 Mass. 356 (1995), is not to the contrary. In that case, we did not consider whether the employer had provided reasonable accommodation to a plaintiff who was able to perform the essential functions of her job. *Id.* at 361-362. That plaintiff, a social worker who had been deaf since birth, was fired for insubordination from her position as a clinical social work supervisor. *Id.* at 357-359. Before being fired, the plaintiff had expressed concerns about the clinic's organizational structure and had asked to renegotiate her job title; when her requests were denied, she unilaterally ordered reorganization and, after a warning, was terminated. *Id.* at 358-359. As is clear from the facts of the *Tate* case, granting the plaintiff's organizational requests would have *neither* permitted the plaintiff to perform the essential functions of her job *nor* rendered the terms, conditions, and benefits that she enjoyed equal to those enjoyed by employees without her handicap. Thus, there was no need to consider whether the employer accommodated the plaintiff's handicap, because she did not make any request for an accommodation that would have enabled her to perform the essential functions of her job, enjoying equal terms, conditions, and benefits.

[21]An employee's obligation to request an accommodation stems from the basic principle that an employer is not required to accommodate a need that it does not know exists. See *Conway* v. *Boston Edison Co.*, 745 F. Supp. 773, 783-784 (D. Mass. 1990) ("Employers cannot be required to accommodate needs they do not know exist"); Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination of the Basis of Handicap Chapter 151B, § II.C (1998) ("An employer is obligated to provide reasonable accommodation only to the known handicaps of an applicant or employee. An employer need not offer or provide reasonable accommodation where it has no knowledge or reason to know of the individual's need for an accommodation"). Consequently, for an employee's actions to constitute a request for accommodation, they must make the employer aware that the employee is entitled to and needs accommodation. Specifically, the request must let the employer know that the employee is a qualified handicapped person, and that the employee is currently unable either to perform the essential functions of his job or to enjoy equal terms, conditions, and benefits of employment.

lighting and a change in work location within the plant in 1993 and 1994, they constitute substantial evidence of an unmistakable request for accommodation. The March 29 letter specifically stated that the demands of Rapoza's work "exceed the physical capabilities placed on him as a result of his limited vision." Additionally, the letter included a copy of the June, 1993, letter, stating that Rapoza's vision caused him "difficulties with depth perception" and requesting "[a]ny help you are able to provide for him in modifying his workplace . . . ." The April 14 letter specifically recommended that Rapoza's work environment be changed so that the stress caused by the physical limitations of his vision problem might be minimized. Essentially, the letter was an indication to Ocean Spray that Rapoza's workplace did not meet his need for accommodation and that a change was needed to avoid serious further risk to Rapoza's health. Finally, the May 17 letter, submitted by Rapoza in response to a request for an update on his condition, once again requested that Ocean Spray "modify[] his work place." These letters constituted a request sufficient to trigger the obligation to participate in the interactive process.

In sum, there is substantial evidence in the record to support the commissioner's conclusion that Rapoza requested accommodation within the six-month limitations period and that, by making no response to these requests, Ocean Spray did not meet its obligations under G. L. c. 151B.

d. *Damages.* A plaintiff cannot recover damages for time-barred events under G. L. c. 151B. *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 530 n.10 (2001). As such, it is an error of law to consider the effect of time-barred events when assessing the scope of a plaintiff's damages, including any damages for emotional distress to which he might be entitled. In this case, the hearing commissioner explicitly stated that, in calculating the damages to which Rapoza was entitled, he considered "the period . . . beginning when he first spoke to his supervisor about his need for accommodation (sometime in May 1993)." Plainly, the hearing commissioner considered

time-barred events in determining the amount of damages owed to the plaintiff; this was an error of law.[22]

4. *Conclusion.* The order of the Superior Court is vacated and the case remanded to the commission for further proceedings with regard to the assessment of damages for the period Rapoza was employed at Ocean Spray within six months of the filing of his charge of discrimination with the commission.

*So ordered.*

---

[22]Because we conclude that the hearing commissioner erred by considering time-barred events in calculating Rapoza's damages, we need not consider Ocean Spray's claim that the amount of damages awarded was excessive.