Tucker, Richard T., J.
This is an employment discrimination case brought by the plaintiff, Robert LaFountaine, III (LaFountaine), against his employer, BJ’s Wholesale Club, Inc. (BJ’s) and several of his co-employees, David St. Paul (St. Paul), Michael Menard (Menard), Maureen McCann (McCann), Elizabeth Pace (Pace), Patricia Parker (Parker) and Joseph Giorgio (Giorgio). LaFountaine’s Complaint asserted claims for discrimination and retaliation in violation of G.L.c. 15 IB against BJ’s, Menard, St. Paul, Pace and McCann, intentional and negligent infliction of emotional distress against BJ’s, Parker, Giorgio, Menard and St. Paul, and false imprisonment against BJ’s, St. Paul and Menard. By an Order dated October 27, 2008, this court (Feeley, J.) dismissed the claims of false imprisonment and intentional and negligent infliction of emotional distress against BJ’s, Menard and St. Paul [24 Mass. L. Rptr. 647). The matter is now before the court on the defendants’ motions for summary judgment on the remaining claims. For the following reasons, their motions are ALLOWED in part, and DENIED in part.

BACKGROUND

The following facts are drawn from the summary judgment record, and are considered in the light most favorable to the nonmoving party, LaFountaine. BJ’s is a wholesale supermarket chain incorporated in Delaware and doing business throughout the northeastern United States. BJ’s has a store in Leominster, Massachusetts. At all times relevant to this case, St. Paul, Menard, McCann, Pace, Parker and Giorgio were employees of BJ’s. LaFountaine suffers from Obsessive-Compulsive Disorder (OCD) and Post-Traumatic Stress Disorder (PTSD) stemming from childhood abuse. He began working at BJ’s around 1999 or 2000, and began working as a meat cutter in the Leominster store in 2003.

The Graffiti Incident

On March 4, 2005, a BJ’s employee discovered graffiti on one of the store’s exterior walls. The graffiti depicted a man’s face in profile with alarge penis in his mouth. Above and to the left was the word “Rob” and an arrow pointing toward the picture. LaFountaine believed a co-worker, Michael Layton, had drawn the graffiti to exact revenge on him due to an incident in which LaFountaine had reported to one of his managers that Layton had used racial slurs during a conversation at work.
LaFountaine reported the graffiti to Parker, who was the manager on duty, and Parker sent Giorgio outside to check it out. Giorgio returned and confirmed the presence of the graffiti. Parker phoned the regional loss prevention manager and sent Giorgio outside to take photographs. She then called the police. LaFountaine accompanied Giorgio outside. After taking several photographs, Giorgio told LaFountaine to kneel next to the picture. According to LaFountaine, the reason for this was that Giorgio wanted to show the resemblance between LaFountaine and the graffiti. The police came later that night to interview several employees, and returned the next day to interview Layton. However, the police investigation never led to any charges being filed against anyone, and BJ’s management did not pursue the investigation any further than their cooperation with the police. By the next day the graffiti was painted over. Giorgio later showed the photographs to one of the assistant managers, Doug Dupell, and Parker showed them to two other managers, Pace and Tara Harrington.
*527 A few days after the graffiti incident, while LaFountaine was working with Menard and another BJ’s employee, Peter Lewis, Menard joked about the graffiti and called LaFountaine a “cocksucker.” Lewis joined in, calling LaFountaine a “faggot.” LaFountaine reported the name-calling to Parker, but did not lodge a formal complaint against Menard or Lewis.

LaFountaine’s 2005 Leave of Absence

On April 15, 2005, LaFountaine checked himself in to HealthAlliance Hospital in Leominster, complaining of depression, anxiety and an inability to cope with stress relating to his relationship with his then girlfriend and what he described as a toxic work environment. With respect to his work environment, LaFountaine complained that he did not get along with his coworkers, felt harassed, and felt that his supervisors were not doing anything about it. He was discharged early in May and returned to work on May 11, 2005. During his stay at the hospital, LaFountaine’s doctor wrote a letter recommending that he be transferred.
After returning to work, LaFountaine told Menard, Pace and Harrington of the reason for his hospitalization. Another manager, Heidi Haase, received several faxes from LaFountaine’s doctor during his leave of absence. Upon his return, many of LaFountaine’s co-workers were welcoming and supportive, but gossip spread about where he had been, and other co-workers used his hospitalization as an opportunity for name-calling. Menard joked about LaFountaine having been in the “loony bin,” and Pace called him a “crazy asshole.” Another worker, Jane Dione, told him he should go take his “crazy pills” during an argument over LaFountaine’s and Lewis’ singing Beatles’ songs at their work station.

LaFountaine’s Attempts to Transfer

In October 2003, LaFountaine, then working at the BJ’s in Westborough, bid for and received the position of meat cutter in Leominster. In September 2004, LaFountaine bid for the position of meat manager in Stoneham, but was denied. LaFountaine did not expect to receive this promotion, since he had only been a meat cutter for a year, but wanted to send a message to the upper management that he was interested in becoming a manager.
In December 2004, as his relationships with his co-workers in Leominster, particularly Layton, continued to deteriorate, LaFountaine sought to transfer back to the Westborough store. However, the manager in Westborough did not respond to LaFountaine, and the position went to someone else. LaFountaine continued to be vocal about wanting a transfer. He claims that, while Pace and other managers would call around informally and arrange transfers for employees who needed them, this was never done for him.
On April 19, 2005, while LaFountaine was on leave, Pace became aware of a meat cutter position that had opened up at the BJ’s in Framingham. Without his express authorization, but believing that he would be interested in the position, Pace filled out a job bid form in LaFountaine’s name and submitted it. LaFountaine eventually got an interview for the position. During the interview, he told the Framingham manager that his primary reason for wanting the transfer was his unhappiness in Leominster. Although LaFountaine felt he made the wrong impression at the interview, in May 2005, he received a call from Mike Anderson in Framingham telling him that he got the job. LaFountaine did not accept, however, because Anderson told him he had to be there within two days and LaFountaine did not have time to arrange childcare and transportation. LaFountaine claimed he made further requests for transfers up to April 20, 2006, his last day of work, but none were ever acted upon.

Reduction of LaFountaine’s Hours

Beginning in August 2005, LaFountaine complained to Pace and Menard that he believed his hours had been cut below the 37.5 per week threshold for full-time employees. BJ’s internal emails reveal that LaFountaine eventually contacted another higher-up, Ken Rowell, to bring the matter to his attention. Rowell’s email to McCann confirmed that, from August to November2005, LaFountaine’s average work week had decreased from 37.5 hours to 31.42 hours. Rowell further stated that “we shouldn’t be cutting full-time hours — it sounds as if this might have happened across the board in this club.” In her reply, McCann told Rowell the decrease came from a “miscommunication that led the club to believe that they could reduce someone with standard hours of 37.5 hours as low as 30 hours.” McCann told Rowell that she discussed the matter with the managers at the Leominster store and told them that full-time workers should not have their hours reduced below 37.5 hours. Though his hours were temporarily restored, LaFountaine claimed that they were cut again in January 2006, and that he was singled out to have his hours reduced.

LaFountaine’s Graves’ Disease

During the fall of 2005, LaFountaine began to experience symptoms of what would later be diagnosed as Graves’ Disease (Graves’).[2] Between the fall of 2005 and May 2006, LaFountaine lost approximately forty pounds. Often LaFountaine would suffer from urgent diarrhea while at work. There are restrooms in the store, one at the back near LaFountaine’s work station, and one at the opposite end of the store that was open to the public. LaFountaine claims that the door by which one gained access to the closer bathroom was locked, that he was not given a key even though he told the managers of his condition.[3] Some of the managers, such as Parker and Liz Averette, would open the door for him when he asked. Menard would open the door for LaFountaine, but “wasn’t happy about it,” and made LaFountaine feel uncomfortable about asking. Pace, however, took a strong stance against LaFountaine using the rear bathroom. On those occasions when LaFountaine was refused access to the rear bathroom he would have to run *528 to the front of the store to use the other bathroom. Twice he was not able to reach the other bathroom in time and defecated on himself. These two incidents both occurred in 2005, prior to LaFountaine’s diagnosis.
When LaFountaine was eventually diagnosed in March 2006, he showed his medical records to St. Paul, but claims that he was still regularly denied access to the closer bathroom. On one occasion within a few weeks from his diagnosis, Pace told him “I don’t care if you have to go down to use the fucking bathroom at McDonald’s down the street, you’re not using that back bathroom.”

Disciplinary Actions against LaFountaine

During LaFountaine’s first twenty-one months with BJ’s he was given only one “corrective,” and his supervisor Haase called his record “impressive.” From July 2005 to April 20, 2006, LaFountaine received at least six correctives, all but the last of which were for tardiness. The final corrective was issued on April 21, 2006, and involved an incident on the previous day in which LaFountaine’s co-worker, Drew Ledger, had taken a radio from one of the store shelves and brought it back to the meat department so that he and LaFountaine could listen to music while they worked. LaFountaine had previously been told that he was not allowed to listen to the radio at work, after another employee complained that the heavy metal LaFountaine was listening to contained language inappropriate for the workplace and was audible to customers standing in line at the deli. Moreover, LaFountaine knew it was a violation of company policy to remove items from the sales floor. The written corrective cites LaFountaine for misuse of company property.
The meeting during which Menard and St. Paul gave LaFountaine this corrective is the subject of much dispute. For the purposes of this motion, the court accepts LaFountaine’s version of the event. On April 21, 2006, Menard and St. Paul called LaFountaine into the manager’s office and confronted him about the radio. The entire meeting lasted about twenty minutes, and Ledger was in the room most of that time. Neither Menard nor St. Paul raised their voices to LaFountaine, nor did they threaten to fire him. They showed him a written corrective and told him he had to sign it. He refused, but Menard and St. Paul insisted. LaFountaine requested to leave several times, and became increasingly agitated. He protested that he was not the one who had physically removed the radio from the sales floor, and therefore should not be punished as if he had. Believing that the corrective was being used to create a pretext for firing him, and that he would lose his job if he signed, he continued to refuse. Eventually, he began to suffer a severe panic attack and Menard and St. Paul allowed him to leave. He fled the premises and has not returned to work since. He has only returned to the store once, when he attempted to return an item for his girlfriend. He experienced sweating and shortness of breath shortly upon entering and had to leave.
LaFountaine filed a petition with the Massachusetts Commission Against Discrimination (MCAD) exactly three hundred days after the meeting with Menard and St. Paul. He subsequently dismissed that petition, electing to proceed against the defendants in the Superior Court.

DISCUSSION

Standard of Review

Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, 404 Mass. at 17. “[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).

Counts I & II: Discrimination in Violation ofG.L.c. 151B and 42 U.S.C. §§12101-17 and Retaliation in Violation of G.L.c. 151B and 42 U.S.C. §§12203(a), (b)

Count I of LaFountaine’s Complaint alleges that BJ’s, St. Paul, Menard and McCann discriminated against him, in violation of state and federal law, by failing to accommodate his OCD/PTSD and his Graves’ Disease. Specifically, LaFountaine claims the defendants failed to accommodate his OCD/PTSD by refusing to grant him a transfer to another store after it had become apparent that the work environment in Leominster was aggravating his mental illness. Further, LaFountaine claims the defendants failed to accommodate his Graves’ Disease by refusing to grant him access to the bathroom near his work station. Count II alleges that BJ’s, St. Paul, Menard and McCann retaliated against LaFountaine for his repeated requests for accommodations by cutting his work hours and giving him excessive disciplinary correctives. The defendants argue that both Counts are barred by the statute of limitations.
Prior to filing a civil suit, plaintiffs are required to make an administrative filing with the MCAD. Everett v. 357 Corp., 453 Mass. 585, 600 (2009). Without such a predicate filing, the Superior Court lacks jurisdiction *529 to entertain a claim under G.L.c. 15 IB. Id. The statute of limitations for making an administrative filing is three hundred days. 804 Code Mass. Regs. 1.10(2). Where the alleged discriminatory acts occurred outside the three hundred day time period, a claimant is barred from making an administrative filing and, ipso facto, from bringing a civil suit. However, Massachusetts courts have recognized the validity of the “continuing violation doctrine,” by which a plaintiff, who has alleged at least one discriminatory act occurring within the three hundred day time period, may sue for acts occurring outside that time period. Ocean Spray Cranberries, Inc. v. Massachusetts Comm’n Against Discrimination, 441 Mass. 632, 643 (2004). In order for this exception to apply, the plaintiff must show “(1) at least one discriminatory act occurred within the [three hundred day] limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts; and (3) earlier violations outside the [three hundred day] limitations period did not trigger [the plaintiffs] ‘awareness and duty’ to assert his rights, i.e., that [the plaintiff] could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory.” Ocean Spray, 441 Mass. at 643.
The defendants argue that Counts I and II are time-barred because (1) the only act occurring within the limitations period — the April 21, 2006 written corrective — was not an act of retaliation within the meaning of chapter 15 IB or the relevant case law, (2) even if it were, it would not be substantially related to previous acts of discrimination, and (3) the previous acts of discrimination, if they occurred as LaFountaine alleges, should have triggered his “awareness and duty” to assert his rights.
Whether the April 21, 2006 written corrective can be considered an act of retaliation within the meaning of chapter 15 IB depends on whether it can be classified as an “adverse employment action.” King v. City of Boston, 71 Mass.App.Ct. 460, 468-69 (2008). Adverse employment action must entail “material disadvantage.” Id. “There must be ‘real harm;’ ‘subjective feelings of disappointment and disillusionment’ will not suffice.” Id., citing MacCormack v. Boston Edison Co., 423 Mass. 652, 664 (1996). “Discharge, however, constructive or otherwise, is not the only ‘adverse employment action’ that can satisfy this element. . . Rather, an adverse employment action, for purposes of Chapter 151B has been broadly defined to include any material ‘disadvantage! ] in respect to salary, grade, or other objective terms and conditions of employment.’ ” Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 157 (1st Cir. 2009), citing MacCormack, 423 Mass. at 672. A reprimand or negative performance evaluation, standing alone, cannot constitute an “adverse employment action.” O'Brien v. Robbins, U.S. Dist. Ct., No. 08-11672, n.7 (D.Mass. 2010), citing Sweeney v. West 149 F.3d 550, 556 (7th Cir. 1998).
Here, LaFountaine claims that he was constructively discharged on April 21,2006 because the threatening and oppressive nature of the meeting caused him to have a severe panic attack and, consequently, that he left BJ’s and has been unable to return. “A constructive discharge occurs when the employer’s conduct effectively forces an employee to resign.” GTE Products Corp. v. Stewart, 421 Mass. 22, 33-34 (1995). “The test is met if, based on an objective assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable.” Id. at 34 (emphasis in original). “A single, isolated act of an employer . . . [such as] ... an unfavorable performance review or even a demotion generally will not be deemed sufficient to support a claim.” Id. Although the defendants aver that the meeting at which the corrective was issued was not threatening or oppressive, LaFountaine’s severe panic attack suggests otherwise. Moreover, a reasonable jury could find that LaFountaine’s previous problems with other employees and managers, even if unrelated to the April 21, 2006 meeting, nevertheless provided a context in which the meeting added to an already exceedingly difficult work situation. Therefore, this court finds there is a genuine issue of fact as to whether BJ’s had rendered LaFountaine’s work life, culminating in the April 21, 2006 meeting with Menard and St. Paul, so intolerable as to constitute a constructive discharge.
LaFountaine attempts to present the April 21, 2006 meeting as a retaliatory action that was “substantially related” to previous discriminatory or retaliatory conduct, thus saving claims originating prior to April 21, 2006. To be substantially related, the anchoring act and the untimely act(s) must “emanate from the same discriminatory animus.” NoviéUo v. City of Boston, 398 F.3d 76,87 (1st Cir. 2005). “Even when retaliation is derivative of a particular act of harassment, it normally does not stem from the same animus.” Id. In Noviello, the court found that the animus that gave rise to one supervisor’s act of sexual harassment was distinct from the animus that gave rise to other employees’ acts of retaliation against the complaining victim. Here, LaFountaine has not offered any evidence as to what the April 21, 2006 written corrective is meant to be in retaliation for, except perhaps a general “distaste for [him] as a person.” See LaFountaine Depo., Vol. 1, 93:10-12.
Yet even if the April 21, 2006 written corrective was an adverse employment action, and even if it bore a substantial relationship to actions falling outside the limitations period, the statute of limitations would still bar Counts I and II because, if LaFountaine’s allegations have merit, then the defendants’ previous conduct would have triggered LaFountaine’s awareness and duty to assert his rights. “When an employer responds to a request for a reasonable accommodation with equivocal action or inaction, the limitations period . . . begins to run at the point thereafter when the employee knew or reasonably should have been aware that the employer was unlikely to afford him a reasonable accommoda *530 tion.” Ocean Spray, 441 Mass. at 645. “That time period cannot go on indefinitely, or it would render the limitations period wholly ineffectual.” Id. As in Ocean Spray, LaFountaine was repeatedly frustrated by his inability to secure a transfer to a different workplace. For approximately a year, from late April 2005, to late April 2006, he claims he was trying to get a transfer. Assuming, as LaFountaine has testified, that the managers at the Leominster store were very generous in helping other employees obtain transfers, but were consistently obstructionist with respect to his requests, then certainly he should have been aware, sometime before the end of that one-year period, that his managers had no intent to help him get transferred.
As for the failure to accommodate his Graves[1] Disease, there is even more reason to conclude that LaFountaine knew, prior to April 21, 2006, that his employer was not interested in giving him an accommodation. In two separate incidents in 2005 LaFountaine defecated on himself in the middle of the store because he could not reach the rear bathroom, yet his supervisors still did not provide him with a key. Even after he showed St. Paul proof of his diagnosis in March 2006 the situation did not change. Indeed, Pace, having been informed of LaFountaine’s diagnosis, flatly denied him an accommodation in crude and abusive language, telling him “I don’t care if you have to go down to use the fucking bathroom at McDonald’s down the street, you’re not using that back bathroom.” “The refusal of an employer to participate in [the process of determining an accommodation], or to make a reasonable accommodation once it has been identified, is a violation of our discrimination laws” that starts the statute of limitations running. Ocean Spray, 441 Mass. at 644-45. Therefore, Counts I & II are time-barred as to all acts prior to the April 21, 2006 corrective meeting. Any claims arising from that meeting are not time-barred.

Count III: Infliction of Emotional Distress (Against Giorgio and Parker)

LaFountaine alleges that Giorgio and Parker intentionally and/or negligently inflicted emotional distress on him by forcing him to pose with his mouth open next to the graffiti that he believed depicted him fellating another man. The summary judgment record shows that Parker was not even in the presence of LaFountaine and Giorgio when Giorgio took the photographs. According to LaFountaine’s own version of events, it was Giorgio alone, not Giorgio and Parker together, who ordered him to pose next to the graffiti. Therefore, Parker is entitled to summary judgment on those claims.
To prevail on his claim for intentional infliction of emotional distress, LaFountaine must prove (1) that Giorgio intended to inflict emotional distress, or knew or should have known that his conduct would cause LaFountaine emotional distress, (2) that Giorgio’s conduct was extreme and outrageous, beyond all bounds of decency and utterly intolerable in a civilized communiiy, (3) that Giorgio’s conduct caused LaFountaine emotional distress, and (4) that LaFountaine’s emotional distress was severe and of such a nature that no reasonable person could be expected to endure it. See Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997). With respect to the second element, Massachusetts courts follow the Restatement (Second) of Torts, §46, comment d (1965), which states thatliabilify cannot be predicated on “mere insults, indignities, threats, annoyances, petfy oppressions, or other trivialities,” but must be so extreme “as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized sociefy.”
This court is a.t a loss to understand why the investigation of the offensive graffiti incident should have included posing LaFountaine next to it. If Giorgio believed that the resemblance between LaFountaine and the man depicted in the graffiti was crucial, a photograph of LaFountaine hardly seems necessary to preserve his appearance, much less a photograph requiring him to pose in a certain manner next to the graffiti. An issue of fact exists as to why LaFountaine was subjected to this and the manner in which the photograph was distributed thereafter, thus precluding summary judgment on LaFountaine’s claim for intentional infliction of emotional distress. An issue of fact also exists as to whether and to what extent this incident contributed to LaFountaine’s depression and subsequent hospitalization one month later, thus precluding summary judgment on his claim for negligent infliction of emotional distress. See Sullivan v. Boston Gas Co., 414 Mass. 129, 137-38 (replacing “physical injury” requirement with requirement of objective corroboration of harm).

ORDER

For the foregoing reasons, the defendants’ Motions for Summary Judgment are ALLOWED in part and DENIED in part. Summary Judgment shall enter in favor of Pace and McCann on Counts I and II, respectively, and in favor of Parker on Count III. BJ’s, Menard, and St. Paul’s Motion for Summary Judgment on Counts I and II is denied.

Graves’ is a thyroid disorder with multiple physical and physiological symptoms including an elevated metabolic rate, weight loss, sweating, palpitations, anxiety, agitation, diarrhea and tremors.

Te summary judgment record contains a photograph of the door through which one must pass to reach the bathroom closest to LaFountaine’s work station. The door bears a sign that reads, in all caps “PLEASE DO NOT EVER PUSH THE BAR. TOUCH METAL PLATE. DOOR IS ALARMED.” Pace testified in her deposition that no one coming from the meat department would need a key to pass through this door, though they would need to be buzzed back in after using the facilities. The door is alarmed, but the alarm only sounds in the receiving area, not in the store itself. However, there is a dispute of fact as to what LaFountaine was told about the alarm, and he contends he was told the alarm would sound throughout the store.