**Yolanda ANDUJAR, and Veronica Gianferri, f/k/a Veronica Bird, Plaintiffs,**

v.

**NORTEL NETWORKS, INC. Defendant.**

**No. CIV.A.02–10509 NG.**

United States District Court, D. Massachusetts.

Oct. 28, 2005.

Jamie E. Balanoff, Jonathan D. Rosenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, for Nortel Networks, Inc, Defendant.

Robert LeRoux Hernandez, Law Offices of Robert L. Hernandez, Newton, MA, for Veronica Gianferri, Yolanda Andujar, Plaintiffs.

GERTNER, District Judge.

Electronic ORDER entered adopting Judge Dein's Report and Recommendations. The race, national origin and gender claims were not clearly differentiated in Nortel's complaint. As such, Judge Dein's footnote (*infra* 400 F.Supp.2d at 312) is not a clear statement on the merits, or the lack thereof.

### REPORT AND RECOMMENDATION ON NORTEL'S MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiffs, former employees of Nortel Networks, Inc. ("Nortel"), have brought this action claiming that they were discriminated against on the basis of sex, race, and national origin, and that they were retaliated against for complaining about such discrimination and for filing complaints with the EEOC, all in violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a) and Mass. Gen. Laws ch. 151B. This matter is presently before this court on "Nortel Network Inc.'s Motion for Summary Judgment" (Docket No. 42). For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned, that Nortel's motion for summary judgment as to Yolanda Andujar be ALLOWED as to her claim of wrongful discharge, but otherwise DENIED, and that the motion for summary judgment as to Veronica Gianferri be ALLOWED.

## II. STATEMENT OF FACTS [1]

### Scope of the Record

In a separate Memorandum of Decision and Order issued on this date, this court

---

**1.** Citations to "DF" are to Nortel Network's Statement of Undisputed Facts In Support of Its Motion for Summary Judgment (Docket No. 44) and the three volumes of Exhibits ("Def.Ex.") submitted therewith (Docket Nos. 45–47). "PR" refers to plaintiffs' response to

has ruled on Nortel's "Motion to Strike Portions of the Plaintiffs' Affidavits" (Docket No. 60) and on the plaintiffs' "Motion to Strike Portions of Defendant's Purportedly Undisputed Facts" (Docket No. 56). For the reasons detailed therein, this court has struck paragraph 54 of the affidavit of Yolanda Andujar and paragraph 70 of the affidavit of Veronica Gianferri. Otherwise, the motions were denied.

The very detailed initial "Statement of Undisputed Facts" filed by Nortel (Docket No. 44), which, in turn, required detailed responses by the plaintiffs, when coupled with Nortel's subsequent extensive objections, has made it extremely difficult, if not impossible, to ascertain the scope of the factual record in this case. There is no question that the record is replete with disputed facts. In fact, in reading this decision, it is safe to assume that Nortel disputes every fact proffered by the plaintiffs for one reason or another, so only certain specific objections will be addressed. The issue before this court is not whether there are disputed facts, but whether any of these disputes rise to the level of material facts sufficient to defeat a motion for summary judgment.

Based on this record, this court has made no attempt to detail every fact asserted and/or challenged by the parties. What follows is this court's attempt to provide a fair description of the relevant material facts and the issues in dispute.

### Statute of Limitations

■ Nortel challenges many of the claims as untimely and, thus, the relevant statute of limitations is important. For a discrimination claim to be timely, a charge of discrimination under Title VII must be filed with the EEOC within 300 days of the alleged discriminatory act. Title VII, 42 U.S.C. § 2000e–5(e)(1). At all relevant times, a charge of discrimination under Mass. Gen. Laws ch. 151B had to be filed with the MCAD within six months of the alleged discriminatory act. Mass. Gen. Laws ch. 151B, § 5 (1989) (amended 2002). *See generally Noviello v. City of Boston*, 398 F.3d 76, 85 (1st Cir.2005).

The plaintiff Yolanda Andujar filed a charge of discrimination with the EEOC and the MCAD on May 12, 2000. (DF ¶ 235). Thus, absent some enlargement of the statutory periods, Andujar's Title VII claims must be based on acts occurring after July 17, 1999 and her state law claims must be based on acts occurring after November 14, 1999. Gianferri filed her EEOC and concurrent MCAD charge on May 9, 2000. (DF ¶ 134). Therefore, the relevant cut-off dates are July 14, 1999 for her federal claims, and November 11, 1999 for her state claims.

### Overview

Defendant Nortel Networks, Inc. ("Nortel") is an internet and communications corporation which does business in Massachusetts. (Compl. ¶ 6, DF ¶ 1). At all relevant times, Nortel had a manufacturing facility in Billerica, Massachusetts, where products such as routers, switches and other networking products were manufactured by both internal and external production operations. (DF ¶ 4). Nortel's Billerica operations came about as the re-

Nortel's statement of facts (Docket No. 56) and "PF" refers to the additional facts submitted by the plaintiffs (also included in Docket No. 56) and the Exhibits ("Pls.Ex.") submitted therewith. "DR" refers to the defendant's response to the additional statements of fact submitted by the plaintiffs

(Docket No. 58) and the one volume of Supplemental Exhibits ("Def.Ex.") filed therewith (Docket No. 61). The plaintiffs' affidavits, "Gianferri Aff." and "Andujar Aff." are attached to Docket No. 56 as Exhibits A and B, respectively.

sult of Nortel's acquisitions of several companies, beginning in 1998. (DF ¶ 3).

The plaintiffs, Veronica Gianferri (nee Bird) ("Gianferri") and Yolanda Andujar ("Andujar"), are Hispanic women. While they both worked at the Billerica facility, they worked in different departments and had different job responsibilities. During their employment at Nortel, there were few Hispanic employees in the Billerica facility. Thus, according to EEOC reports filed by Nortel, in 1999, only 10 of the 325 employees at the Billerica facility were Hispanic, in 2000 11 of the 315 employees were Hispanic and in 2001 8 out of 266 employees were Hispanic. (PF ¶¶ 13–15). Based on her personal observations, Andujar attested that there were never any minorities in positions of authority at Nortel, with the exception of two work coordinators who had been appointed to those positions by predecessor corporations. (PF ¶ 12; Andujar Aff. ¶ 33).[2] Of these work coordinators, one—Doris Andujar— was allegedly replaced by a white male, Dave Philbrick, on or about April 19, 1999. (PF ¶ 12; DF ¶ 41). The other Hispanic woman, Deak Buth, left the company in the Spring of 1999. (PF ¶ 21). She was replaced by Bill Lynch, another Caucasian male. (PF ¶¶ 20, 22; DF ¶ 198). According to Andujar, Nortel never promoted a minority to a position of authority during her tenure. (Andujar Aff. ¶ 33).

Both Andujar and Gianferri contend that they were denied a number of promotions during their tenure at Nortel due to their status as Hispanic women.[3] Andujar also contends that a number of positions were never posted, and that, in certain circumstances, job titles were created simply to justify pay raises. Coincidental with these claims of failure to promote, Andujar also claims that she was paid less for equal work. Finally, Andujar contends that in response to complaints she made, the company wrongfully retaliated against her and eventually terminated her employment.

As detailed below, this court finds that there are material facts in dispute which preclude the entry of summary judgment on Andujar's timely claims of failure to promote, unequal pay and some claims of retaliation, and that Andujar has raised sufficient facts to support a finding that Nortel acted with discriminatory animus. However, Andujar has not established that her lay-off as part of a facility-wide reduction-in-force was based on an improper motive.

Gianferri's principal claim is that she suffered a hostile work environment as a result of having complained about sexual harassment by a co-worker in 1994. However, this claim, as well as many of her other claims, are time-barred. To the extent that Gianferri has asserted that she was the subject of discrete acts of discrimination within the relevant time periods, she has not presented sufficient facts to establish that these acts were motivated by discriminatory animus.

### Yolanda Andujar

Nortel summarizes Andujar's claims as being the alleged discriminatory failure to promote her to several positions during the period between 1998 and 2000,

---

**2.** While Nortel has moved to strike these personal observations (which motion was denied), it has not submitted any conflicting facts.

**3.** While the plaintiffs contend that they were discriminated against on the basis of sex, even viewing the facts most favorable to the plaintiffs does not support a finding of discrimination other than on the basis of their status as Hispanic women. A number of Caucasian women were promoted over the plaintiffs' objections.

retaliation for complaining internally about discrimination in the form of a lateral transfer in 1999, wage discrimination as compared to seven other employees, retaliation for filing an EEOC complaint in the form of a transfer to a new department in June 2000, denial of a training opportunity in 2000, issuance of two written warnings in March 2001, and, finally, a discriminatory and retaliatory layoff in 2001. (*See* Memorandum of Law in Support of Nortel Networks, Inc.'s Motion for Summary Judgment (Docket No. 43) ("Nortel Mem.") at 3–4). Andujar contends that not only has she stated a claim for specific discriminatory acts, but she also has asserted "a system of continuing discrimination where Nortel and its predecessors systematically discriminated by avoiding the posting of jobs, creating new titles, positions, and salary scales for non-Hispanics, allowing Hispanics to assume responsibilities and workloads but not the position and pay." (Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Docket No. 55) ("Pls.Mem.") at 34). Nortel has moved for summary judgment on all of Andujar's claims, basically contending that the factual record is insufficient to establish that Nortel acted with discriminatory intent as a matter of law.

### Andujar's Employment with Nortel

Andujar is an Hispanic female of Puerto Rican origin who resides in Brockton, Massachusetts. (Compl.¶ 5). She had several years of experience with Nortel's predecessor, Xylogics, where she did assembly and testing work. (DF ¶ 138). Andujar was hired on December 9, 1996 for the position of "Assembler Tester I" on the Remote Access (RANX) production line. (DF ¶ 137). Her supervisor was Jim Mikelonis ("Mikelonis") and her starting salary was $21,840. (*Id.*). The responsibilities of this position included assembling products, testing products and entering results into the TRACS system, and performing final inspections for configuration, defects, and appearance. (DF ¶ 139). After six months, Andujar's salary was raised to $22,381. (DF ¶ 140). On November 3, 1997, she was promoted to "Assembler Tester II"[4] and received another salary increase, this time to $24,800. (DF ¶ 141). Mikelonis found Andujar to be "one of the most productive members of the RANX line and to be an excellent On-the-Job Trainer." ("OJT"). (PF ¶ 18).

In October 1998, Mikelonis was laid off, and was replaced by Michael Barrington ("Barrington"), who became Andujar's new supervisor. (Andujar Aff. ¶ 6). Barrington's supervisor, in turn, was Senior Production Manager Mitchell Hale ("Hale"). (*Id.* ¶ 9). With the replacement of Mikelonis with Barrington and Hale, Andujar contends came a pattern of failure to promote, discrimination and unequal pay.

According to Andujar, around this time, Hale required that "English only" be spoken on the production floor. (PF ¶ 17). Thus, in his diary, Hale noted that "Josie [was] upset about asking people to only speak eng. in workplace. Once again explained why." (Pls. Ex. I at entry for March 20, 1998). For its part, Nortel disputes that English only was required and asserts, "[f]or purposes of summary judgment only," that "managers *recommended* to the employees on their production lines that they speak English while working on the manufacturing floor." (Nortel Networks Inc.'s Reply to Plaintiffs'

---

4. Nortel contends that Assembler Testers I, II, and III perform the same job function, the only difference being the number of years of assembly experience the employee has. (DF ¶ 142).

Response to Motion to Strike Portions of Nortel Networks Inc.'s Statement of Undisputed Facts (Docket No. 58) ("Nortel Fact Reply") at 19, ¶ 17).

In addition, according to Andujar, in her position as an OJT, she was training Caucasians with higher titles and salaries than her own. (PF ¶ 20). These workers included Donna Rondeau, Susan Bagrowski, Robert Thompson and Bill Lynch. (PF ¶ 20). According to Andujar, and denied by Nortel, these non-Hispanic employees were paid more than she was, and they were given new, unadvertised "promotions" to justify their pay raises. (See, e.g., PF ¶¶ 25–30).[5] Moreover, despite the fact that Andujar had to train Donna Rondeau, Andujar contends (and Nortel denies) that Hale attempted to replace Andujar with Rondeau as the OJT in 1997. (PF ¶ 19).

Unlike Mikelonis, Barrington reported that Andujar complained about other RANX line employees and did not get along with them. (DF ¶ 145). Thus, in his performance evaluation of Andujar in December 1998, one month after he had begun supervising her, Barrington was generally satisfied with Andujar's job performance, except for her attitude. (DF ¶ 146). Barrington noted that Andujar could be defensive, that she should work harder to accept support from management, and that she needed to work better with the Work Coordinator. (DF ¶ 146). Andujar expressly denies making many of the negative statements attributed to her by Barrington, claiming that he manufactured them in an effort to protect himself

against her discrimination charges. (See, e.g., Andujar Aff. ¶¶ 7–9, 19; PR ¶ 36).

### Failure to Promote to Assembler Tester III

Andujar contends that Barrington wrongfully refused to promote her to Assembler Tester III and that he "manufactured" a log of events to distort the record to show she was a problem employee. (See Reply Memorandum of Law in Support of Nortel Networks Inc.'s Motion for Summary Judgment (Docket No. 59) ("Nortel Law Reply") at 28). As detailed below, Andujar ultimately was promoted to the rank of Assembler Tester III, but only in response to her complaint to the Human Resources Department ("HR"). Nortel has moved to strike "Andujar's conclusory allegation that Barrington fabricated a log of events for the purpose of establishing a record against her [because it] is pure speculation and unsupported by any facts whatsoever." (Id. at 28–29). However, the motion to strike has been denied as Andujar clearly has personal knowledge as to whether events in which she was allegedly involved took place. Moreover, if Barrington fabricated a record, that fact would be evidence that he acted with an improper motive. See Lipchitz v. Raytheon Co., 434 Mass. 493, 501–02, 751 N.E.2d 360, 368 (2001) (fact finder is permitted to infer discriminatory animus if employer offered a false reason for an adverse employment action).

While Andujar received a salary increase following her December 1998 per-

---

**5.** To an extent, Andujar's negative experiences with her supervisor, Mike Barrington, may have been shared by others. An employee opinion survey showed that employees found that it was hard to find out what opportunities were available, they felt that not everyone got the same opportunities, they did not know what was needed for advancement, not all jobs were posted, decisions on hiring were made before interviews, and job descriptions did not match actual jobs. (PF ¶ 16; Pls. Ex. H). However, the composition of the group responding to the survey is unknown, so it may (or may not) reflect only Hispanic employees' perceptions.

formance evaluation, it was less than others had received and Andujar complained to Barrington and Hale. (Andujar Aff. ¶ 11). In response, Hale apparently spoke with RANX line members and determined that "at times Andujar was uncooperative." (DF ¶ 149). At this point, Hale advised Andujar that she needed to improve her cooperation so as to improve her overall job performance. (*Id.*).

### Failure to Promote to RANX Work Coordinator

In the Spring of 1999, Deak Buth, the work coordinator of the RANX work cell, left the company. (PF ¶ 21). Andujar contends that she became the de facto work coordinator, although the title and salary were given to Bill Lynch, a white male, who she had trained. (PF ¶¶ 21 – 22). In fact, Andujar contends that although Lynch was appointed work coordinator and paid over $10,000 more than she was, Lynch did not seem to understand the RANX assembly and testing and Andujar continued to do the actual work of work coordinator. (Andujar Aff. ¶ 13). Nortel strenuously denies that Andujar was a de facto work coordinator at any time in her career, and there is a dispute as to the duties that the work coordinator actually performs.[6] However, this court does note that in his July 1999 evaluation of Andujar, Barrington found that Andujar had trained new employees, and "has been the backup person for the RANX Work Coordinator." (Def.Ex. 59). He also noted that Andujar was "trained in all aspects of RANX product testing, assembly and data entry." (*Id.*). Thus, there are factual disputes as to whether Andujar was qualified to be a work coordinator.

In response to Andujar's claim of failure to promote, Nortel has presented a number of what it contends are legitimate business reasons for Barrington's decision to promote Lynch, including Andujar's alleged bad attitude. (*See* Nortel Law Reply (Docket No. 59) at 29–30). However, the record is far from clear either that Andujar had a poor attitude or that Barrington actually believed that she had such a negative attitude. As Barrington wrote in a memorandum to Hale in July 1999:

> Yolanda Andujar's annual Focal Review is scheduled for November 1, 1999. I recommend we pull her review in early to July 1, 1999.
>
> Yolanda' performance and cooperation have been exceptional. Over the past 7 months, since her last review, she has covered many areas of responsibility within and outside her normal job duties. Yolanda is one of our most knowledgeable people in the RANX area.
>
> I recommend this early review coupled with a 2% market adjustment. This will place her just under the midpoint of the Assembler/Tester 2 range.

(DF ¶ 150, Ex. 58). Moreover, as noted above, other reviews challenge Barrington's assertion that Andujar did not have the skills to be a work coordinator.

Despite its positive tone, Andujar was dissatisfied with her July 1999 performance review because she wanted to be promoted and she felt that she should have had the job of work coordinator. (DF ¶ 153). Furthermore, according to Andujar, "[s]imilarly situated white employees who ran a cell in the absence of a work coordinator received monetary compensation, promotions or both. For example, in 1998 David Philbrick received a pride

---

6. Nortel's objections are detailed more fully in the Memorandum of Decision and Order on Motions to Strike filed on this date.

award, including cash compensation, for taking over a work cell coordination during the coordinator's medical leave, and he was shortly thereafter promoted to work coordinator. Similarly, Susan Bagrowski received a pay increase for helping out in coordinating the instant internet work cell." (Andujar Aff. ¶ 18). As evidence that this disparate treatment was due to discrimination, Andujar cites to a situation which arose with Hale. Thus, around this time, Hale separately called in Andujar and Joselina Ortega, both Hispanics, to ask what they knew about rumors that employees were planning to sue Nortel for racial discrimination. (PF ¶ 33). Andujar told him truthfully that she knew nothing about it, but felt intimidated by his questioning. (Id.; Andujar Aff.¶ 17). Nortel's policy on equal employment and affirmative action was that "complaints of discrimination by employees were to be treated as confidential and that persons making or participating in the investigation of such complaints were to be free from intimidation or retaliation." (PF ¶ 34). This exchange makes it clear that the role of Hispanic employees at Nortel was a topic of concern and discussion. A jury may find that Hale violated company policy and was trying to intimidate Andujar.

Andujar also cites to an incident with Barrington as evidence of discriminatory intent. According to Nortel, in September 1999 Barrington offered to let Andujar transfer to the BAC line to "learn a new product and develop new skills," but Andujar declined the offer. (DF ¶ 154). Andujar categorically denies that such an offer was ever made. (Andujar Aff. ¶ 21). Moreover, according to Andujar, at around this time she asked Barrington why she was not being promoted or given a raise for the job she was doing, and he "got angry" at her, told her that she "needed more experience to be able to do this job" and said that "his hands were 'tied' and he

sneered at [her]." (Andujar Aff. ¶ 16; PF ¶ 31). A jury may infer that Barrington was telling her that the door to promotion was closed to her regardless of her credentials.

Andujar complains, in general, that she was not afforded the opportunities that her non-Hispanic colleagues were given. As summarized in Plaintiffs' Memorandum:

> During the period that she did higher-level, more demanding work than Rondeau, Bagrowski and Thompson—including work coordinator functions, OJT functions and lead cycle-count functions—she was compensated less. Nortel concedes that Bagrowski and Rondeau consistently received higher salaries than Andujar, and that it paid a higher (undisclosed) salary to Thompson than to Andujar. Rondeau's higher salary was justified by creating a new position for her, Senior Final Assembler, and Bagrowski's was justified by creating a new position for her, "Senior Electro–Mechanical Assembler," neither of which positions was advertised, posted or made available to Andujar. Patricia Queen, who worked as an Assembler/Tester but did less than Andujar, had an annual salary of between $36,000 and $37,900, more than $10,000 above that of Andujar, who earned $26,000 by the end of 1998.

(Pls. Mem. (Docket No. 55) at 6–7 (internal record citations omitted)).

### Andujar's Promotion to Assembler Tester III

Andujar complained to Human Resources ("HR") representatives Kelley Bowers ("Bowers") and Elizabeth Busch ("Busch") in September 1999 that she was not being promoted on account of her race, nationality, and gender, and they indicated that they would investigate her complaint.

(DF ¶¶ 155–156, PF ¶ 35). However, there is evidence that they apparently did not even interview Barrington during the course of this investigation. (*See* PF ¶ 36). Andujar found their investigation to be unsatisfactory and went to HR a second time to re-open the investigation. (DF ¶ 157). Bowers and Busch notified Andujar on October 12, 1999 that while they found no discrimination, they did find "some inequities with regard to the timing of job progression within the same job family." (DF ¶ 158). Thus, according to HR, Barrington had "more rigid" standards than other product managers. (DF ¶ 160).

The record reflects that on October 12, 1999, Andujar received the following memorandum from HR:

> Thank you for coming forward with your concerns regarding equitable employee treatment and allowing us to conduct an investigation. Nortel Networks does not tolerate any form of discrimination. We have researched pertinent dates and interviewed a number of employees in your organization.
>
> We have identified some inequities with regards to the timing of job progression within the same job family; however, we did not find evidence that these inequities are race related.
>
> As a result of our investigation, we are re-classifying you to the position of Assembler/Tester III along with other individuals, both minority and non-minority.
>
> Please be advised that both the contents of the investigation and the outcome are confidential and should not be disclosed to anyone who does not have a legitimate business need to know.

(Def.Ex. 61). In fact, two of the three employees who received promotions as a result of Andujar's complaint were minorities. (DF ¶ 162).

According to Andujar, HR also told her at a meeting on October 12, 1999 that Barrington had resigned, and asked her how she felt about that. (Andujar Aff. ¶ 23). This may be seen as an effort to make Andujar feel guilty about causing Barrington to lose his job. Viewing the evidence most favorably to the plaintiff, if Barrington was never questioned and two of three persons elevated were minorities, a fact finder may conclude that the company's assertion that there was no race-related reason for the discrepancy was a cover-up. Andujar was promoted effective November 6, 1999 and her salary was raised to $29,494. (DF ¶ 163).

### Andujar's Transfer to the BFR Line

After Andujar was promoted by HR, Hale transferred her to a position as a Senior Assembly Tester for a new product line called BFR. (DF ¶¶ 164, 168). The job involved primarily packing. (DF ¶ 165). Nortel contends that Hale chose Andujar for the position because the RANX line had decreased in volume and did not require as many employees, she was the most senior Assembler Tester from that line, and this was an opportunity for her to learn a new product and develop her skills. (DF ¶¶ 167–168). According to Andujar, however, this change stripped her of all her testing and higher level duties, and also required her to lift heavy objects. (Andujar Aff. ¶¶ 24–25). Given the timing of the transfer, so soon after HR had promoted her, a fact finder may infer that the transfer was in retaliation for Andujar's complaint. This transfer resulted in no loss of pay, but Andujar felt that "it caused [her] to lose self confidence, peace of mind, health, [her] trust in others and [her] pride." (DF ¶ 169, Andujar Aff. ¶ 27). She also contends that Hale's journal entries concerning conversations that she allegedly had with Hale about the job

change were fabricated. (Andujar Aff. ¶¶ 25, 28). According to Andujar, Hale took the position that she could not do testing on the BFR line because she did not have the proper training. However, when she asked to receive the training, she was refused this opportunity. (*Id.* ¶ 30). This was but one of several instances when she was denied the opportunity to take classes which would enable her to advance in the company. (*Id.* ¶¶ 32–33).

Andujar complained to HR that the job change was in retaliation for her previous complaint. (DF ¶ 175). HR responded by letter dated January 5, 2000 stating that "[b]ased on the information gathered to date, we have determined that there is an insufficient basis for concluding that retaliation has occurred." (Def.Ex. 63). No further details are provided.

### Andujar's Transfer and Failure to Promote to Sales Work Coordinator

Andujar filed a complaint with the EEOC and MCAD on May 24, 2000. (Andujar Aff. ¶ 34). The BFR line was canceled in June 2000. (DF ¶ 178). Andujar was transferred to work in the Sales Order Coordination Department. (DF ¶¶ 179–182). She understood that she had. been assigned to work as a sales work coordinator, which she viewed as a long-awaited promotion. (Andujar Aff. ¶ 37). Nevertheless, just three days later, her new manager, Gerry Cavallo ("Cavallo"), requested that Andujar move to the Spares Department to pick and pack product parts because another employee had gone out on leave, and the Department needed temporary coverage. (DF ¶ 182; Andujar Aff. ¶ 38). Andujar agreed to help out. (*Id.*). When the employee returned from leave, Andujar went back to work in the Sales Coordination Department. (DF ¶ 183, Andujar Aff. ¶ 39).

It is undisputed that after a short period, Andujar was told that she had to return to the Spares Department and that a white female, Marion Tenters–Blaisdell, was sent to the Sales Coordination Department in her place. (DF ¶¶ 184–85). Nortel contends that there was a shortage of employees in the Spares Department, that neither Andujar nor Tenters–Blaisdell was given a permanent position in Sales Coordination because there was no need for an additional full term employee there, and that Tenters–Blaisdell was only placed there for training. (DF ¶¶ 184–187). Therefore, according to Nortel, Andujar cannot establish that there was a vacant position, that she was qualified for the job, or that the position was otherwise filled. (Nortel Law Reply (Docket No. 59) at 30–31). The parties' opposing positions illustrate that material facts concerning these claims are in dispute.

Andujar attests, without reservation, that she was made to understand that she would become a sales coordinator, and that no one ever suggested to her that there was no vacancy for that position. (Andujar Aff. ¶ 37). Moreover, she asserts that Cavallo told her that her assignment as a sales work coordinator "was a mistake" because Tenters–Blaisdell "had complained she wanted the position;" he did not state that no such position existed. (*Id.* ¶ 39). Andujar also contends that memoranda produced by Nortel allegedly reflecting conversations with her about this subject were "completely made up after the fact." (*Id.* ¶ 41). Finally, while Andujar admits that Tenters–Blaisdell was not ultimately given the sales coordinator position, Andujar contends that Tenters–Blaisdell was given a new position of responsibility, created for her, inspecting products, but that Andujar was never given such an option. (*Id.* ¶ 44). Nortel disputes these facts.

According to Andujar, she suffered emotional and physical harm as a result of Nortel's conduct. Consequently, she took a medical leave of absence until January 24, 2001. (*Id.* ¶ 42). Andujar contends that when she returned to work in the Spares Department, Cavallo "continued to make it clear that I was not welcome" giving her two written warnings and singling her out "for a minor, meaningless incident." (*Id.* ¶ 45).

### Unequal Pay Claims

Andujar contends that she received unequal pay in that other employees were given additional titles to justify earning more money. Nortel contends that this argument must fail as a matter of law because Andujar did not perform the same jobs as some of the employees, there were non-discriminatory reasons for the pay disparities, and there is no evidence of discriminatory pretext. (Nortel Mem. (Docket No. 43) at 38–41). The factual record concerning the jobs that these workers performed is replete with disputes. For example, Andujar contends that she trained Donna Rondeau and did higher level testing work than Rondeau when they both worked on RANX, but Rondeau had a higher position and salary. (Andujar Aff. ¶ 50). Andujar contends that she did the same type of assembly work as Susan Bagrowski, and in fact she had additional responsibilities, yet Bagrowski was paid more. (*Id.* ¶ 51). Based on her personal observations, Andujar claims to have had the same jobs as Donna Rondeau, Susan Bagrowski, Robert Thompson, Bill Lynch and Pat Queen, yet they were paid more. (*Id.* ¶ 52). Moreover, several of these individuals were given titles such as "Senior Field Assembler" or "Senior Electro–Mechanical Assembler," according to Andujar, which were never posted or described. (*Id.* ¶ 53). Nortel either disputes these facts or has moved to strike them.

### Andujar's Termination from Nortel

In or around April 2001, Nortel decided to cease all production activities at the Billerica facility and to outsource manufacturing operations to subcontractors. (DF ¶ 9). Andujar was laid off from Nortel on October 8, 2001. (DF ¶ 189). At that time, 124 out of 126 employees and managers in Nortel's Billerica production operation were laid off as well. (*Id.* ¶ 9; Gignac Aff. (Def.Ex. 3) ¶¶ 7, 9). Those laid off included all 121 non-exempt employees working in Manufacturing Operations, including Andujar. (*Id.* ¶¶ 8–9). Andujar has submitted no facts which establish that she was in any way singled out or discriminated against in connection with her termination.

### Veronica Gianferri

Nortel summarizes Gianferri's claims as being for failure to promote to various positions, wage discrimination, retaliation for filing an EEOC charge in the form of a written warning issued in 2000, alleged discriminatory and retaliatory layoff in 2001, alleged sexual harassment by a coworker in 1995, and retaliation for complaining about the harassment in the form of a verbal reprimand and hostile treatment between 1995 and 1998. (Nortel Mem. (Docket No. 43) at 3). Nortel contends that most of these claims are time-barred, and that the record does not support the claims. (*Id.* at 5). For her part, Gianferri contends that most of the harm she suffered was as a result of her complaints about sexual harassment, and that she was subject to a hostile work environment in retaliation for her complaints. As detailed below, this court recommends that summary judgment be entered in favor of Nortel on all of Gianferri's claims.

### Gianferri's Employment by Nortel

Gianferri was hired by Nortel as a regular, full-time employee on November 15, 1993. (Gianferri Aff. ¶ 5). She was hired

as a PCB Rework Specialist in the Repair Depot, also known as the Remanufacturing Department. (DF ¶¶ 5, 11). Her supervisor was Tom Maziarz. (*Id.* ¶ 11). Things went smoothly until 1994, when Gianferri became subjected to unwanted physical touching and sexual advances by a coworker, Steve Stancato. (Gianferri Aff. ¶¶ 6–13). After Gianferri complained to Maziarz, Maziarz gave her negative performance reviews, and engaged in conduct which demeaned and ridiculed her. (*Id.* ¶¶ 9–15, 30–31, 37–38). Moreover, Maziarz encouraged other employees to harass and ridicule Gianferri as well, and did nothing to stop abusive behavior directed at her. (*Id.* ¶¶ 11, 32–34).

Following Gianferri's complaint about Stancato's sexual harassment, Maziarz sent her a "Notification of Investigation Findings" dated March 19, 1995. (Gianferri Aff. ¶ 12, attachment 1). Therein, Maziarz wrote that "[w]hile our investigation has found no evidence of harassment of a sexual nature, it has found evidence of harassment. Appropriate corrective action has been taken with Steve." (*Id.*). Maziarz continued, however, as follows:

> In addition, be reminded that effectiveness with people is one of the six critical factors in every employee's performance rating, and includes ability to cooperate with others, ability to interact in a positive and professional manner, showing courtesy, consideration, and respect, and ability to behave maturely and professionally even in difficult situations. As has been documented in your past performance appraisals and reinforced in numerous conversations over the past year, this is an area of continuing need for you. Your on-going attention to this performance deficiency requires your utmost priority.

(*Id.*).

Maziarz did send a written warning to Stancato concerning his harassment of Gi-

anferri, including "ongoing and unwanted questions into Veronica's personal life, and other unwanted discussions of a non-work related nature." (Def.Ex. 41). According to the warning, such harassment was continuing "in spite of multiple verbal warnings during the last year[.]" (*Id.*). Stancato was also "reminded that effectiveness with people is one of the six critical factors in every employee's performance rating, and includes ability to cooperate with others, ability to interact in a positive and professional manner, showing courtesy, consideration, and respect, and ability to behave maturely and professionally even in [a] difficult situation." (*Id.*). Following these events, however, Maziarz gave Stancato a performance rating of "3" (meets full requirements) for "effectiveness with people/teamwork." (Pls.Ex. X). Gianferri, however, was rated as "not meet[ing] requirements" for her interpersonal skills within the group. (Def.Ex. 13).

Gianferri contends that much of her adverse treatment at Nortel was in retaliation for her complaints about Stancato's sexual harassment. As Gianferri summarizes her claims:

> On the basis of facts not genuinely in dispute and reasonable inferences from those facts, Gianferri is entitled to present her case of discrimination and retaliation to the jury. The undisputed evidence shows that after Gianferri complained about sexual harassment by a co-worker, her supervisor, Thomas Maziarz ("Maziarz"), engaged in a campaign of retaliation, which included tolerating and encouraging harassment by co-employees, publicly berating and humiliating Gianferri and giving her negative performance evaluations which suggested wrongly she had difficulties in dealing with peers, although any difficulties she may have had were direct-

ly instigated by Maziarz. As a direct consequence, Gianferri was repeatedly denied promotions because, in substantial part, of the wrongful perception that she lacked interpersonal skills. Ultimately she was terminated as part of a Reduction in Force largely because of her low ranking by Mike McCarthy, who had himself demonstrated hostility toward Gianferri and was aware of her complaint to EEOC.

(Plaintiffs' Response to Reply of Defendant Nortel to Plaintiffs' Opposition to Nortel Motion for Summary Judgment ("Pls.Resp.") (Docket No. 64) 4–5).

Thus, Gianferri contends that in response to her complaints about Stancato, Maziarz continued to lower her ratings, and deliberately understated her contributions to the company. (*See, e.g.,* Gianferri Aff. ¶¶ 15–28). Furthermore, Maziarz publicly humiliated her and made her the "scapegoat" for all of the group's problems. (*Id.* ¶¶ 30–32). Other employees, seeing the way Maziarz was treating her, also treated her abusively and teased her about her sexual harassment complaint. (*See id.* ¶¶ 32–34). Gianferri attributes her problems with her co-workers to the fact that she had complained to Maziarz and Human Resources about Stancato. (*Id.* ¶ 36).

### Failure to Promote to Work Coordinator

Gianferri also contends that Maziarz wrongfully failed to promote her to the position of Work Coordinator on July 1, 1996, and instead hired a white male named James Barrett. (DF ¶ 39; Gianferri Aff. ¶ 39). While Nortel contends that it had a business reason for hiring Barrett, Gianferri attributes this failure to promote not only to her complaint about sexual harassment but also to Maziarz' belief that she "was less competent than [her] peers because of [her] Hispanic ethnicity." (Gianferri Aff. 43). As evidence of this alleged anti-Hispanic attitude, Gianferri asserts that although she is fluent in English, Maziarz ordered her to take an English as a Second Language Course, and threatened to fire her unless she took the classes and passed a proficiency test. (Gianferri Aff. ¶ 43).[7] Gianferri passed the test, with the instructor noting that she was too advanced for the course. (*Id.*). Moreover, throughout the years 1995 to 1998, Maziarz allegedly informed Gianferri "that higher positions were only meant for the white people and the men of the group." (Gianferri Aff. ¶ 46).

### Gianferri's Transfer to Documents Department

In October 1998, the Company transferred Gianferri to the Documents Control Department to work as a Documentation Coordinator under the supervision of Joe Morgida. (DF ¶ 20; Def. Ex. 18).[8] Dave McGrath was her immediate supervisor.

---

7. Nortel challenges Gianferri's affidavit on this point as "misleading" since Gianferri did not take the course, and her employment was not terminated as a result. (*See* Nortel Networks Inc.'s Motion to Strike Portions of the Plaintiffs' Affidavits (Docket No. 60) ("Nortel Motion to Strike") at 17). However, the statement allegedly made by Maziarz is relevant to his state of mind.

8. Gianferri places the transfer to the Documentation Group as taking place in 1999.

(*See* Gianferri Aff. ¶¶ 48–49). However, she did not contest DF ¶ 20 which places the date of transfer as October 1998. Moreover, Def. Ex. 18 appears to be a letter co-signed by Gianferri, dated, in her handwriting, as October 8, 1998, confirming her transfer to the position of Documentation Coordinator under the supervision of Joe Morgida, "Manager, Document Control." Remarkably, in an effort to refute Gianferri's assertion that she told a manager (Morgida) that she was leaving work early on March 29, 2000, as re-

(Gianferri Aff. ¶ 53). According to Gianferri, she was unhappy about the transfer, and it was not a voluntary move, although she does not contend that it resulted in any adverse consequences. (*Id.* ¶¶ 49, 52). Furthermore, she had to train Terri Baril, a non-Hispanic woman, to take over some of her duties in remanufacturing. (*Id.* ¶ 49). As detailed *infra*, several years later, in 2000, Baril was awarded a coordinator's position for which Gianferri had applied. (*Id.* ¶ 50).

Gianferri contends that in connection with her move to the Documentation Group, she was not given an office but was forced to sit in an aisle where people kept bumping into her and laughing at her because she had to give herself insulin shots. (*Id.* ¶ 52). McGrath admitted that Gianferri complained many times about being out in the aisle, because with her diabetes "she felt it was degrading to her to be there in that particular space." (Def. Ex. 94 at p. 25). Consequently, and after much discussion with other supervisors, Gianferri's space was changed by adding a wall. (*Id.*). Based on the record before the court, it appears that any delay in constructing the wall was caused by logistical problems, and not due to any hostility toward Gianferri. (*Id.*).

Once ensconced in the Document Control Department, according to Gianferri, her managers noted that she did not have any interaction problems with her peers. (Gianferri Aff. ¶ 53). For example, in a review dated October 26, 1999, McGrath wrote as follows:

Veronica has done a very good job learning the many processes and systems

used by the Documentation Control & Services processes over the last six to twelve months. The training and knowledge that Veronica has gained has positioned Veronica to be a major contributor to the business, especially, as the business completes the transition to being a Nortel System House and completes the transfer and ownership of all West Coast sustaining products.

Veronica works well with her peers and customers and is always looking for ways to improve and do her very best. Her work is done accurately, professionally and on time. Veronica has proven that she is flexible and adaptable and takes on projects and tasks freely and eagerly. She is dependable and gets the job done.

Veronica has not found it easy being a member of the Doc group due to a number of issues unrelated to her but related to management with regard to how to best utilize Veronica and her abilities and skills. The reason for this is that her role and responsibilities have not been clearly defined to her. This has been corrected. Veronica is eager for more responsibility and has on numerous occasions expressed a desire for more responsibility. This will be looked at very seriously and I look forward to working with Veronica in defining her responsibilities and matching her skill sets for future tasks.

. . . . .

Overall, I am very satisfied with Veronica's performance and look forward to working with Veronica and integrating her fully into the numerous processes

quired by Nortel's policies, Nortel has moved to strike "plaintiffs' characterization of Joe Morgida as a manager" as being inadmissible because Gianferri lacked personal knowledge as to Morgida's status at the time, and he was no longer a manager. (Nortel Motion to Strike (Docket No. 60) at p. 11; *see* Nortel Fact Reply (Docket No. 58) at pp. 27–28, ¶ 78 and discussion, *infra*). There is no evidence that Gianferri would have known that Morgida was no longer a manager. The motion to strike has been denied.

we use in Documentation Control & Services in the coming year.

(*Id.;* Def. Ex. 20). Other internal Nortel "Feedback Forms" also support this positive evaluation of Gianferri.[9] Thus, in a Form dated February 21, 2001, Peter Bard, an engineer who apparently interacted with Gianferri in connection with "processing AVL requests" stated as follows;

> I have had the pleasure of working with Veronica over the pass [sic] few years. She consistently demonstrates a commitment to completing all the AVL request[s] that we have asked her to process, many times on short notice. In addition, she often will ask questions to verify the accuracy of the information needed to process the AVL's. We consider Veronica a valuable asset to the Documentation group.

(Gianferri Aff. ¶ 58, attachment 2). Similarly positive feedback was received from John J. Kocsis, Jr. on February 16, 2001. (*Id.,* attachment 3). Both of these co-workers ranked Gianferri in the "strongly recommend" range with respect to whether they would recommend this person for similar work at Nortel. (*Id.,* attachments 2 and 3). Thus, many of Gianferri's problems at the company seem to have been resolved with her transfer from under Maziarz's supervision.

### Unequal Pay

Gianferri does contend that while in the Documentation Group she "trained a number of non-Hispanic, white individuals who were afterwards placed above me in the company hierarchy, such as Debbie Ioca-

bucci, Luminitza Bancesco, Cathy Strain, Linda Dussault and Debra Swanberry." (Gianferri Aff. ¶ 54). In particular, she assisted them in writing Engineering Change Orders ("ECOs") and trained them on Aspect as well as other computer programs. (Gianferri Aff. ¶¶ 55–56, 64–66). The record establishes, however, that for the most part either there was an objective reason for pay differentials or, in fact, there was no differential. Moreover, Gianferri has not submitted any evidence that any of the decision makers in the Documentation Group acted with any discriminatory animus.

Debra Swanberry did have a higher position in the company and did earn a higher salary as an exempt employee. (Nortel Mem. (Docket No. 43) at 20). The fact that Gianferri may have helped train Swanberry does not alter the fact that they had different jobs at the company, and thus a claim of unequal pay must fail. While the discrepancy in positions may have been the result of a failure to promote Gianferri to Swanberry's position, Gianferri has not asserted such a claim.

With respect to Luminitza Bancesco and Cathy Strain, both of whom Gianferri contends she trained, the undisputed facts establish that Gianferri was paid more than they were, so any claim of unequal pay must fail. (*See* Nortel Mem. (Docket No. 43) at 22 n.24). Finally, with respect to Debbie Iocabucci and Linda Dussault, while Nortel challenges Gianferri's personal observation that they all performed the same job function, it offers no facts to counter that conclusion. (*Id.* at 20–21).[10] Nortel's explanation for their higher pay is

**9.** Nortel's motion to strike these forms as hearsay was denied because they appear to be business records of Nortel. In addition, Nortel contends that these documents were not appropriately identified in discovery, a matter about which this court has insufficient infor-

mation. The denial of the motion to strike was without prejudice to renewal of the motion at trial if appropriate.

**10.** Dussault joined the Documentation Group in 2000. (Gianferri Aff. ¶ 68).

that they started with the company in 1993 (Iocabucci) and 1996 (Dussault) and, at the time of their transfer into Documentation, they were earning higher salaries which the company did not reduce. (*Id.* at 22). While this does not explain why they were earning significantly more than Gianferri, who also started with the company in 1993, it is not enough to state a claim of discrimination. The record is devoid of any factual assertions which would link the pay differentials to a discriminatory animus.[11]

### Failure to Promote to Remanufacturing Work Coordinator

Gianferri challenges various promotions given to others. (*See* Gianferri Aff. ¶ 60). Specifically, on February 22, 1999, Dan Dunne selected Ron Nelson, a white male, for the position of Remanufacturing Work Coordinator. According to Dunne, he asked Gianferri and Nelson the same technical questions, and found Nelson to be more qualified. (DF ¶ 65). Gianferri does not dispute that the questions were asked, but denies that Dunne tested either of them. (Gianferri Aff. ¶ 61). Gianferri does not contend that Dunne had any anti-Hispanic animus. The only evidence presented as to Dunne's intent was that Dunne believed that Gianferri lacked leadership ability and interpersonal skills based on comments made by Jim Bart, the Work Coordinator at the Remanufacturing Department where Gianferri had worked under Maziarz. (DF ¶ 66; Def. Ex. 23 at 26–27).

On April 19, 1999, Dunne selected Dave Philbrick to serve as Work Coordinator in the board test area of Remanufacturing. Again, Nortel contends that Dunne be-lieved Philbrick had the technical skills and leadership qualities to serve as a Work Coordinator. (*See, e.g.,* DF ¶¶ 67–73). While during discovery Gianferri challenged this selection, in connection with the summary judgment motion Gianferri does not dispute the facts asserted by Nortel, nor does she contend that Dunne acted with any discriminatory intent.

### Failure to Promote to Materials Program Manager

Shane Donahue selected Joe Pierro to be Materials Program Manager on June 21, 1999. Nortel contends that Pierro, who had been working for the company in a similar position for approximately four years, was hired because Donahue believed that he possessed the key job qualifications—prior experience dealing with contract manufacturers, prior experience with and knowledge of Nortel's manufacturing process, and knowledge of production materials. (DF ¶¶ 75–78; Nortel Mem. (Docket No. 43) at 12). Again, while challenging this action previously, in connection with the present motion Gianferri does not challenge Pierro's qualifications, nor does she attribute a discriminatory animus to Donahue.

### Failure to Promote to Material Analyst Planner

Gianferri does challenge the promotion of Kellie Schumm to the position of a Material Analyst Planner (or Materials Control Supervisor) on June 21, 1999. Tom Doyle made the appointment. (*See* DF ¶ 82). According to Nortel, this position required the employee to work with

---

11. Gianferri also claims to have been paid less than two work coordinators, James Barrett an Ron Nelson, a Materials Analyst Planner Kellie Schumm, and a Manufacturing Engineer Lyle Eiben. (*See* Nortel Mem. (Docket No. 43) at 17–21). These individuals clearly had different jobs than Gianferri, and she does not contend otherwise. Her complaint, therefore, is at most a claim of failure to promote to those positions. To the extent that Gianferri has asserted such failure to promote claims, they will be discussed *infra*.

Nortel's vendors who performed repairs on customers' products; to perform inventory planning to ensure that such vendors had a sufficient amount of materials; and to undertake inventory analyses to determine whether inventory forecasts were accurate. (DF ¶ 83). Nortel contends that the employee needed a Bachelor's degree, prior experience with inventory planning and strong computer skills. (DF ¶ 84). Nortel contends that Schumm met these qualifications, while Gianferri did not have experience with inventory analysis and planning, and did not have a high school diploma. (DF ¶¶ 84–89).

Gianferri challenges Schumm's appointment as follows:

> it is my recollection that a BS was not required if the candidate had equivalent hands-on work experience. I had significant experience working with outsource houses which, in combination with the fact that I was an internal candidate, should have made me more qualified than Ms. Schumm. In fact, Harvey Abbot, who interviewed me for the position, told me that I was the strongest candidate, indeed that I was perfect for the job and that he could learn a few things from me, because of my technical experience among other things. Tom Doyle, on the other hand, plainly did not want to interview me, as his interview lasted about one minute.

(Gianferri Aff. ¶ 62). Gianferri, however, does not specifically attribute any discriminatory animus to Doyle.[12]

According to Gianferri, she complained to HR that she was discriminated against on the basis of her Hispanic ethnicity in connection with Schumm's appointment. (Gianferri Aff. ¶ 63). For unexplained reasons, HR conducted an investigation on the basis of a gender discrimination claim and concluded, not surprisingly, that Gianferri "was not discriminated against on the basis of Gender because the person hired in to [the] position that she applied for was a Female." (Pls.Ex. AA). However, the HR report went on to say that "[t]he qualification that this individual had over Veronica was more education, specifically in the area of system and computer skill and more potential to grow with the organization". (*Id.*).

### Failure to Promote to Work Coordinator

Finally, Gianferri challenges Dunne's decision to promote Terri Baril to the position of Work Coordinator of the Remanufacturing Department in November 2000. (*See* DF ¶ 92). As detailed above, Gianferri contends that she trained Baril for her position in Remanufacturing in 1998. (Gianferri Aff. ¶ 64). Dunne contends, however, that Baril was the best choice because she had been working in the department for several years as of the time of promotion, and had been performing many of the jobs of the Coordinator. (DF ¶ 92). As Nortel argues, even if Gianferri was qualified for the job, by the time of the appointment Gianferri had been working elsewhere for several years. (Nortel Mem. (Docket No. 43) at 13).

### The Challenged Reprimand

According to Gianferri, on March 29, 2000, the "last incident" which evidences the hostile work environment to which she was subjected occurred. (*See* Pls.' Mem. (Docket No. 55) at 37). Thus, according to Gianferri, she had to leave work early on

---

**12.** While there was deposition testimony from Busch of HR that, based on her memory, Maziarz may have participated in the interviews for this position, since Gianferri does not contend that Maziarz was involved in this hiring process, this court will assume that he was not involved. (*See* Pls. Ex. Z).

March 29, 2000. (Gianferri Aff. ¶ 67). The company had a policy as to who to notify under such circumstances. (DF ¶ 117; Def. Ex. 38). According to Gianferri:

> The policy stated that if the employee's manager was unavailable, the employee could speak with any available manager. On March 29, 2000, I had to leave the work area early and could not find my manager. In accordance with the company policies, I spoke with another manager who was available, Joe Morgida, who had previously been my manager. I also left a voice message with my manager, Mike McCarthy. When I returned, I was called into the office by Rick Croteau [Director of Technical Operations], and Elizabeth Busch, [Human Resources representative], who began yelling at me and gave me a written warning, refusing to listen to my explanation or to the fact that I had complied with company policy in speaking with Mr. Morgida. It was evident that they wished to use this occasion to punish me regardless of the actual facts. Ms. Busch was at the time well aware of my previous complaints of discrimination.

(Gianferri Aff. ¶ 67). Gianferri received a written warning relating to the March 29th incident on May 30, 2000, a few weeks after Gianferri filed her EEOC complaint. (DF ¶ 119; Def. Ex. 39).[13] She went out on leave on June 22, 2000 for surgery. (Gianferri Aff. ¶ 68).

### Gianferri's Termination from Nortel

According to Nortel, in 2001, the company decided to cease all activities in the Billerica facility, and to outsource the manufacture of Nortel products. (DF ¶ 9). This outsourcing required the elimination of many positions, including the documentation function that had been performed in the Documentation Control Department. (Curran Aff. (Def.Ex. 4) ¶ 8). According to Nortel, at the time, there were seven employees in the Documentation Control Department, three of whom, including Gianferri, performed mostly clerical functions involving data entry (such as updating information maintained in computerized databases) and distribution of documentation to the production floor. (Id. ¶ 6(a)). Based on the outsourcing, there was to be a reduction in force in the Documentation Department (and elsewhere), and the job responsibilities of those remaining would change. (Id. ¶¶ 9–10).

McCarthy was asked to rank order employees. (DF ¶ 31). Gianferri was ranked 50th out of 51. (Curran Aff. ¶¶ 11–13). Nortel retained Joe Morgida (rank 8/51), Debra Swanberry (36/51) and Deb Iocabucci (26/51) in the Documentation Control Department. (Id. ¶ 14). All three women who performed, according to Nortel, mostly clerical functions, including Gianferri, Luminitza Bancesco (46/51) and Cathy Strain (42/51), as well as Linda Dussault (43/51), who performed the same functions as Iocabucci, but was less senior, "were laid off from employment based upon their relatively lower performance rankings and their less overall skill, ability and experience." (Id. ¶ 15 and Tab B).[14] McCarthy himself was also laid-off. (Id. ¶ 17). In describing the reason Gianferri was laid off in internal documents, John Curran,

---

13. There is some evidence that Croteau knew about her EEOC complaint filed on May 24, 2000. *See* note 16, *infra.* However, the complaint had not been filed as of March 29, 2000, and thus could not be the motivation for the oral reprimand.

14. Of the group laid off, Gianferri was the only one ranked by McCarthy as a "low contributor." The others were ranked as "core contributors." Curran Aff. 11 and Tab A.

then Director of Technical Operations, and McCarthy's manager, wrote: "performs a clerical function including data entry, updating information and parts lists in system, from work instructions prepared by others. All three personnel performing this function have been impacted." (*Id.* ¶ 17 and Tab B).

Gianferri objects to her ranking by McCarthy, contending that "it was me who trained in the other employees in document control, whether in preparing ECOs or computer programs. My output was second to no one in the department." (Gianferri Aff. ¶ 57). Gianferri also contends that a significant portion of her work was not clerical, and challenged Curran's knowledge of her work since he had only arrived a few months before her termination. (Gianferri Aff. ¶ 69).[15] Gianferri has submitted evidence that McCarthy knew that she had filed an EEOC complaint, apparently as of the time he made the rankings.[16] (Gianferri Aff. ¶ 59). However, there is no evidence that McCarthy had any animus toward Gianferri. In fact, as detailed previously, McCarthy had been a strong supporter of Gianferri. The fact that he gave her a low rating when asked to rate her contribution to a significantly revamped "department" with different job responsibilities does not compel a different conclusion.

## III. *ANALYSIS*

### A. *Summary Judgment Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to in-terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004). "Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue." *Id.*

"Neither conclusory allegations nor improbable inferences are sufficient to defeat summary judgment. Rather, to withstand a properly supported motion for summary judgment, the opposing party must present enough competent evidence to enable a factfinder to decide in its favor on the disputed claim." *Carroll v. Xerox Corp.,* 294 F.3d 231, 236–37 (1st Cir.2002) (internal punctuation and citations omitted). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003) (internal quotations omitted). "Where, however, the non-moving party has produced more than that, trial

---

**15.** Curran contends that he only completed the forms because McCarthy was no longer employed. (*See* Curran Aff. ¶ 17).

**16.** According to Gianferri, McCarthy told her that a manager "Rick Croteau had told him that if he had his way he would fire me because of my EEOC charge." (Gianferri Aff.

¶ 59). Nortel's motion to strike this as hearsay was denied because it is not being offered for the truth, but rather as to McCarthy's state of mind. Gianferri attests that this conversation took place when McCarthy gave her a review. (*Id.*) However, the date of this review has not been identified.

courts should 'use restraint in granting summary judgment' where discriminatory animus is in issue." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997) (quoting *Valles Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984)).

### B. *Discrimination Claims—Standard of Review*

#### *Failure to Promote and Unequal Pay*

■ Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, Mass. Gen. Laws ch. 151B, § 4 makes it unlawful "[f]or an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation ... genetic information, or ancestry of any individual to ... discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." Claims of disparate treatment on the basis of an employee's protected status fall squarely within the purview of these statutes. *See, e.g., Rodriguez v. Smithkline Beecham,* 224 F.3d 1, 7–8 (1st Cir. 2000) (addressing Title VII claims alleging failure to promote and wage discrimination on grounds of sex discrimination); *Lipchitz v. Raytheon Co.,* 434 Mass. 493, 494, 751 N.E.2d 360, 363 (2001) (addressing Chapter 151B claim alleging failure to promote due to gender discrimination).

■ Because the record contains no direct evidence that Nortel's conduct was motivated by discrimination against Hispanics, the familiar *McDonnell Douglas* burden-shifting framework applies to the plaintiffs' discrimination claims. *See Rodriguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 19 (1st Cir.1999); *Sullivan v. Liberty Mut. Ins. Co.,* 444 Mass. 34, 39–40, 825 N.E.2d 522, 530 (2005). Under this framework, the plaintiff must first make out a prima facie case of unlawful discrimination by presenting "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (internal quotations and punctuation omitted). "Once the plaintiff satisfies the prima facie requirements, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for its action." *Rodriguez–Torres v. Caribbean Forms Mfr., Inc.,* 399 F.3d 52, 58 (1st Cir.2005). In the final stage of the *McDonnell Douglas* framework, the burden shifts back to the plaintiff employee to "demonstrate that the defendant's proffered reason was pretext for discrimination." *Id.* At all times, the plaintiff has the ultimate burden of showing "that the defendant intentionally discriminated against her." *Id.*

■ The plaintiffs contend that the Supreme Court's decision in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), altered the last step in the *McDonnell Douglas* analysis by allowing the plaintiff to provide evidence showing either (1) that the defendant's reason for its adverse employment action is merely a pretext for discrimination or (2) that the defendant's reason, while true, is only one reason for its conduct, and that another motivating factor is the plaintiff's protected characteristic. (*See* Pls. Mem. (Docket No. 55) at 31). The impact of *Desert Palace* on the traditional burden-shifting framework remains unclear, and the First Circuit has yet to decide the issue. *See Tobin v. Liberty*

*Mut. Ins. Co.,* No. Civ. A. 01–11979–DPW, 2004 WL 1922133 *6 n. 10 (D.Mass. Aug.30, 2004). What is clear, however, is that under either approach, "plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." *Hillstrom v. Best Western TLC Hotel,* 354 F.3d 27, 31 (1st Cir.2003). Moreover, *Desert Palace* makes it clear that "to establish a discriminatory motive, circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *E.C. Waste, Inc. v. NLRB,* 359 F.3d 36, 42 (1st Cir.2004) (quoting *Desert Palace,* 539 U.S. at 100, 123 S.Ct. at 2154) (internal punctuation omitted).

### Hostile Work Environment and Retaliation

■■ The plaintiffs also contend that they were subjected to a hostile work environment and otherwise retaliated against in response to their complaints about the wrongful conduct to which they were allegedly subjected. "To establish a prima facie case of retaliation in the workplace, [a plaintiff] must demonstrate that: (1)[she] engaged in protected conduct under Title VII [and ch. 151B]; (2)[she] suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity." *Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir.1998). Adverse job actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Id.; see also Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir.1994). In addition, "under Massachusetts law as under Title VII, subjecting an employee to a hostile work environment in retaliation for

protected activity constitutes an adverse employment action[.]" *Noviello v. City of Boston,* 398 F.3d, 76, 91 (1st Cir.2005).

■ A plaintiff may recover under a hostile work environment theory when "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 84 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)). The work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that [the plaintiffs] in fact did perceive to be so." *Conto v. Concord Hosp., Inc.,* 265 F.3d 79, 82 (1st Cir.2001) (internal quotations and citations omitted). *See also Muzzy v. Cahillane Motors, Inc.,* 434 Mass. 409, 411, 412 n. 2, 749 N.E.2d 691, 694, 695 n. 2 (2001). "This is not, and by its nature cannot be, a mathematically precise test." *Harris v. Forklift Sys., Inc.,* 510 U.S. at 22, 114 S.Ct. at 371. Therefore, the decision as to "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. However, "no single factor is required." *Id. See also Messina v. Araserve,* 906 F.Supp. 34, 36 (D.Mass.1995) (court must consider totality of the circumstances in evaluating hostile work environment claim under Chapter 151B).

■ Both the First Circuit and the Supreme Judicial Court of Massachusetts have cautioned courts evaluating a hostile

work environment claim to consider the cumulative effect of the alleged hostile acts over time to determine whether, "when linked together, the seemingly disparate incidents may show a prolonged and compelling pattern of mistreatment that have forced a plaintiff to work under intolerable ... conditions." *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 533, 750 N.E.2d 928, 937 (2001). *Accord O'Rourke v. City of Providence,* 235 F.3d 713, 730 (1st Cir.2001) (directing courts to consider the totality of the circumstances and not to view conduct as isolated from the larger pattern of acts). Furthermore, this court must consider both the particular instances of discriminatory conduct that obviously concern the plaintiffs' gender, race or national origin, and alleged instances of unequal treatment "such as work sabotage, exclusion, denial of support, and humiliation [that] can in context contribute to a hostile work environment[.]" *O'Rourke,* at 730.

### C. *Statute of Limitations*

As detailed below, Nortel challenges a number of the plaintiffs' claims as being untimely. For statute of limitations purposes, "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002). Each failure to promote is deemed a separate act, with the statute beginning to run on that date. *Id.* at 114, 122 S.Ct. at 2073; *Ocean Spray Cranberries, Inc. v. MCAD,* 441 Mass. 632, 641, 808 N.E.2d 257, 265–66 (2004). Similarly, each paycheck is a separate event in an unequal pay claim, with the statute beginning to run on that date. *See Nat'l R.R. Passenger Corp.,* 536 U.S. at 111–12, 122 S.Ct. at 2071; *Bazemore v. Friday,* 478 U.S. 385, 395–96, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986).

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Nat'l R.R. Passenger Corp.,* 536 U.S. at 115, 122 S.Ct. at 2073. Consequently, a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [statute of limitations] time period." *Id.* at 122, 122 S.Ct. at 2077. Thus, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120, 122 S.Ct. at 2076. *See also Cuddyer,* 434 Mass. at 539, 750 N.E.2d at 941–42. If there are related acts which fall within the statutory time period, the earlier, time barred actions are admissible as background evidence for proof of the hostile work environment, although damages for the specific time barred events are not recoverable. *Cuddyer,* at 530, n. 10, 750 N.E.2d at 935, n. 10. *Accord Ocean Spray,* 441 Mass. at 647, 808 N.E.2d at 269–70.

### D. *Andujar's Claims*

Nortel has moved for summary judgment on the basis that Andujar has failed to establish that Nortel acted with discriminatory intent, and that the undisputed facts establish that Andujar's claims lack merit. This court disagrees, and recommends that except for Andujar's claim of unlawful termination, Nortel's motion for summary judgment should be denied.

### *Discriminatory Intent*

Nortel's principal argument is that Andujar has failed to meet the final prong of the *McDonnell Douglas* analysis and establish that the company acted with discriminatory intent. However, viewing

the record in the light most favorable to Andujar, a fact-finder may conclude that she has met her burden of proof.

For example, but without limitation, Hale's requirement that English only be spoken in the workplace may be viewed as evidence of an anti-Hispanic intent. *See Rivera v. Baccarat, Inc.,* No. 95 Civ. 9478 MBM JCF, 1997 WL 777887, at *4 (S.D.N.Y. Dec.15, 1997) (English only rule may provide evidence of discriminatory animus). His questioning of Andujar concerning potential lawsuits by Hispanic employees may be similarly viewed. If a jury believes Andujar's unequivocal testimony that Barrington and Hale fabricated events in response to her claims that she was being discriminated against, it may infer discriminatory animus from that as well.

Nortel's repeated failure to promote Andujar, especially when coupled with the failure to post jobs and evidence that job titles were fabricated to justify pay raises for Caucasian employees is further evidence of discriminatory intent. Indeed, the fact that almost no minorities held supervisory positions at the company contributes to an inference that the highest positions of Nortel's business were closed to Hispanics, and supports Andujar's claim that the decisions not to promote her were discriminatory. *See Lipchitz,* 434 Mass. at 508–09, 751 N.E.2d at 373 (evidence that no women were in upper corporate ranks of company suggests that highest ranks of employer's organization are closed to a protected class, and may support an inference that a particular decision was "tainted by an unlawful bias."). Moreover, additional circumstantial evidence of discriminatory intent can be found in the fact that the HR department did, in fact, conclude that Andujar had been wrongfully deprived of a promotion to an Assembler Tester III, but only after being asked twice by Andujar to conduct an investigation into the matter. A fact finder may conclude that the initial investigation was cursory at best, with the alleged perpetrator not even being interviewed. The subsequent conclusion of no race discrimination may be viewed with scepticism given that two of the three employees affected were minority employees, a striking percentage given the small number of Hispanics at the facility in total.

■ Similarly, there is sufficient evidence that Andujar suffered adverse job actions in retaliation for her complaints. Thus, shortly after her complaints to HR about discrimination resulted in her promotion to Assembler Tester III, she was transferred to a new position with lesser responsibilities. Although this may not have resulted in a decrease in pay, it still may be found to be an adverse job action. *See Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 23–25 (1st Cir.2002) (transfer accompanied by significant change in responsibilities, but involving no decrease in salary may constitute adverse employment action). The timing of the transfer is also significant and may be considered in determining whether it was in retaliation for her protected activity in complaining about her treatment at work. *See Clockedile v. New Hampshire Dep't of Corr.,* 245 F.3d 1, 6 (1st Cir.2001) (timing of conduct in relation to plaintiff's complaint creates an arguable inference of retaliation).

■ Andujar's treatment with respect to her transfer to the Sales Order Coordination Department may also be found to be in retaliation for her internal complaints about her treatment and/or her filing of her EEOC complaint. Again, the timing of the abrupt withdrawal of the promised position as sales work coordinator shortly after the filing of the EEOC complaint may be considered. *See id.* In addition to being direct evidence of discrimination, the

fact that Tenters–Blaisdell was treated more favorably than Andujar may be found to be punishment (retaliation) for her complaints of unequal treatment.

If Andujar's evidence is believed, she also may be found to have established that she was subjected to a hostile work environment in retaliation for protected activity. *See Noviello,* 398 F.3d at 91, 93 (false accusations, work sabotage and denial of support create a hostile work environment). A jury may conclude that the pervasive intimidation and insults to which she was subjected, especially the constant unequal treatment, denial of support, and exclusion from opportunities, resulted in a "prolonged and compelling pattern of mistreatment that . . . forced a plaintiff to work under intolerable . . . conditions." *Cuddyer,* 434 Mass. at 533, 750 N.E.2d at 937. Moreover, a jury may find that this atmosphere of discrimination, combined with the hostility directed toward Andujar, took its toll. According to Andujar, Nortel's conduct caused her to suffer emotional and physical harm. In fact, Andujar felt compelled to take a medical leave of absence as a result. *See Noviello,* 398 F.3d at 94 (physical and psychological harm provides evidence of hostile work environment).

■ "By its nature, a hostile work environment often means that there are a series of events which mount over time to create such a poisonous atmosphere as to violate the law." *O'Rourke,* 235 F.3d at 727. As a result, the question as to when offensive conduct does in fact become unlawful is often better resolved by the fact-finder at trial, and not on summary judgment. *See id.* at 732. This is such a situation.

### Sufficiency of the Evidence—Failure to Promote/Unequal Pay

Nortel contends that it has articulated a legitimate non-discriminatory reason for its actions in promoting individuals other than Andujar and for discrepancies in pay. It argues further that Andujar has not established that its reasons are pretextual at all, much less a pretext for discrimination. However, this is not a case where the plaintiff is relying on conclusory and unsubstantiated general assertions of wrongdoing to support her claim. *Compare Benoit,* 331 F.3d at 174 (no basis for jury to believe that employer's reasons for adverse job action were pretextual where plaintiff failed to present evidence that similarly situated employees were treated differently, could not dispute evidence of his own inadequacies, and presented no other facts showing discriminatory animus). Rather, Andujar has put forth sufficient facts to meet her burden of proof.

With respect to the claims of failure to promote, as detailed above there are disputed facts about each challenged action from which a jury may conclude that Andujar suffered disparate treatment. Andujar has established her qualifications for the various positions and has produced sufficient facts to challenge Nortel's allegedly valid business reasons for its decisions. Andujar also has put forth facts sufficient to question whether titles were fabricated and positions renamed in an attempt to circumvent a discrimination claim. Under such circumstances, the motion for summary judgment must fail. *See Lipchitz,* 434 Mass. at 498–99, 751 N.E.2d at 366 (where jury could find that reason given for failure to promote was false, employee evaluations suggested that plaintiff was qualified for a management position, and jury could believe plaintiff's testimony that her difficulties with her managers were not the result of her personality and workstyle, there was sufficient evidence to survive a motion for directed verdict in a sex discrimination suit).

Andujar's unequal pay claims should also survive the motion for summary judgment. As detailed above, Andujar has raised sufficient facts to create a dispute as to whether her work and pay were comparable to others. Much of the unequal pay claim is premised on the argument that Andujar was not given promotions (and pay raises) to which she was entitled. The resolution of these factual disputes should await a trial.

### Sufficiency of Evidence—Wrongful Termination

■ The one claim which should be dismissed is Andujar's claim of wrongful termination. In view of the undisputed facts that the manufacturing operations were being closed down, and that there was a lay-off of every non-exempt employee in the department, Andujar cannot establish that her termination was a pretext for discrimination. The court's task "is not to evaluate the soundness of [Nortel's] decision making, but to ensure it does not mask discriminatory animus." *Sullivan,* 444 Mass. at 56, 825 N.E.2d at 541. Where, as here, the plaintiff "has not established with credible evidence that [the company's] proffered reasons for her lay-off were merely a pretext for a true intent of [race and/or national origin] discrimination," summary judgment in the defendant's favor is warranted with respect to Andujar's claim for wrongful termination. *Id.* at 55, 825 N.E.2d at 540.

### Timeliness of Andujar's Claims

Without much discussion, Nortel contends that some of Andujar's claims of unequal pay, and her challenge to the 1997 promotion of Donna Rondeau to Senior Final Assembler, are untimely. (*See* Nortel Law Reply (Docket No. 59) at 10). This court agrees that unequal pay claims arise at the time of each paycheck, and that a failure to promote claim arises when the wrongful act occurs. Thus, some of these actions are untimely as discrete claims. However, to the extent that these facts are relevant to the question whether Andujar suffered a hostile work environment in retaliation for her complaints, they are admissible.

As detailed above, if there are acts within the statutory time period which are related to an employee's hostile work environment claim, then earlier, time-barred actions are nevertheless admissible as background evidence for proof of the hostile environment. *See Cuddyer,* 434 Mass. at 530 n. 10, 750 N.E.2d at 935 n. 10. In Andujar's case, there is no question that actions related to her hostile work environment claim, such as failures to promote, occurred within the statutory time period. As a result, the challenged actions would be admissible even if Andujar could not seek damages directly attributable to those untimely acts. The final analysis of the scope of damages being sought is better left to pre-trial memoranda, and the motion for summary judgment as to specific paychecks or particular promotions should be denied.

### E.  Gianferri's Claims

Nortel has moved for summary judgment on Gianferri's claims on the grounds that they are barred by the statute of limitations, that she has failed to submit evidence of discriminatory intent and that the record does not support a conclusion that Nortel's reasons for its actions were pretextual. This court agrees and recommends that the motion for summary judgment as to Gianferri's claims be allowed.

### Timeliness of the Claims

■ Gianferri's principal contention is that she suffered from sexual harassment in 1994 from her co-worker Steve Stanca-

to, and that the abuse to which she was subsequently subjected arose as a result of her complaints about that treatment. Because there are no acts which are related to her retaliation claim which arose in the statutory period, all these claims are time barred. Based on the record before the court, there was a clear change in Gianferri's circumstances after she left the Remanufacturing Department, and Maziarz' control, in 1998. The abuse stopped, and there is no evidence that the various other people who made the decisions that Gianferri is now challenging were aware of the alleged sexual harassment and her earlier complaints.

As detailed above, a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [statute of limitations] time period." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 122, 122 S.Ct. at 2077. In the instant case, however, none of the events which transpired after 1998 were related to Gianferri's claim of retaliation for her complaints about sexual harassment. Consequently, Gianferri's claim of discrimination based on retaliation for complaints about sexual harassment are not timely and should be dismissed.

When Gianferri left Maziarz's domain, she worked for McCarthy who gave her very good reviews. According to Gianferri herself, her problems with co-workers had ended. None of the other managers involved in the promotion of other employees seem to have had any relationship with

Maziarz or with the sexual harassment of 1994. Under such circumstances, there was no related event within the statute of limitations which would render the earlier actions relevant.

### Sufficiency of the Evidence

Unlike Andujar, Gianferri has not established that Nortel acted with discriminatory intent with respect to events which occurred after she left the Remanufacturing Department.[17] She has not established a hostile environment, established a prima facie claim for wage discrimination, or presented sufficient evidence to support a finding by a jury that the reasons given for Nortel's job actions were pretextual. Therefore, summary judgment is appropriate.

Since the events which occurred while Gianferri was working for Maziarz are not related to her later claims, they cannot be considered in evaluating Gianferri's charges. Thus, the analysis of the record begins with events occurring in and after July, 1999. During this period, Gianferri contends that she was paid less than others performing the same work. However, as detailed above, these claims are not supported by the factual record. Either the employees had different job responsibilities or they were, in fact, paid less. *See Rodriguez*, 224 F.3d at 8 (absent a showing that plaintiff's job functions and responsibilities were substantially comparable to those of others who were paid more, plaintiff cannot make out a prima facie case of wage discrimination). With

---

17. Gianferri recognizes that her claim is premised on a claim that she was retaliated against because of her complaints about Stancato. Thus, it is only in a footnote that she asserts that while "there is very strong evidence that retaliation [for her claim of sexual harassment] was the primary motivating force in her mistreatment by Nortel... because

there is such significant evidence of bias against Hispanics and women as well, as she has pointed out in her affidavit, the court should permit the trier of fact to consider such evidence as well and not grant summary judgment to Nortel on the basis of the record." (Pls. Mem. (Docket No. 55) at 36 n.11).

respect to only two employees, Iacabucci and Dussault, there is a factual dispute as to whether they performed the same work as Gianferri. However, with respect to those employees, the record is devoid of any information as to who set their pay, when their pay was set, or the intent of those involved in the decision. The conclusory allegations that these employees were paid more and, therefore, there must be discrimination, is insufficient to overcome a motion for summary judgment. *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 77–80 (1st Cir.2004) (plaintiff cannot survive summary judgment on wage discrimination claims where there is insufficient evidence of discriminatory intent).

The only timely claim of failure to promote is the appointment of Terri Baril to the position of Work Coordinator of the Remanufacturing Department in November 2000. However, there is no evidence that Dunne, who made the appointment, harbored any discriminatory intent. Moreover, at the time of the appointment, Baril had been working in the department for several years, and Gianferri had been out of the department for several years. Gianferri has not proffered any evidence to negate the legitimate business reason put forth by Nortel for hiring Baril as opposed to Gianferri. *See Gu v. Boston Police Dep't*, 312 F.3d 6, 12–13 (1st Cir.2002) (summary judgment appropriate where defendant provided a legitimate explanation for its decision to promote and plaintiffs failed to present sufficient evidence to undermine defendant's nondiscriminatory rationale).

■ Gianferri points to her reprimand of March 29, 2000 as evidence of the hostile work environment to which she had been subjected. As an initial matter, there is no evidence of discriminatory intent in the reprimand. Gianferri's charges of sexual harassment had been made years earlier, and she had not yet filed a complaint with the EEOC. The record does not establish a connection between the reprimand, as upsetting as it was, and any protected activity.[18]

Furthermore, the reprimand does not rise to the level of a hostile work environment. Gianferri has not shown that the reprimand was part of an overall work environment in which she was subjected to harassment based on her race or national origin that was "sufficiently severe or pervasive to alter the conditions of [her] employment . . . ." *Conto*, 265 F.3d at 82. At best, she has shown only that the reprimand was "a single act of harassment [that] may not be actionable on its own." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115, 122 S.Ct. at 2073. Even when the reprimand is coupled with the other timely claims, Gianferri has not established an actionable hostile work environment.

Finally, Gianferri cannot overcome the legitimate business reason given by Nortel for her lay-off, along with various others in the Documentation Control Department. McCarthy who himself was laid off, did the rankings. The only evidence in the record is that he was a strong supporter of Gianferri's. The individuals who were retained had different job responsibilities and titles than Gianferri. Finally, a year had passed since Gianferri had filed her EEOC claim—there is no timely connection to establish that her termination related to her EEOC complaint. *See Benoit*, 331 F.3d at 175 (evidence that plaintiff was terminated more than one year

**18.** While the written warning followed on the heels of the filing of the EEOC complaint, the warning did not lead to any adverse job action. Moreover, Gianferri's complaint is with the fact that she was yelled at unfairly, and the fact that there was a subsequent written warning is very secondary.

after he had complained of discrimination insufficient to forestall summary judgment). Because Gianferri has failed to "produce evidence that the real reason for the employer's actions was discrimination," *Gadson v. Concord Hosp.*, 966 F.2d 32, 34 (1st Cir.1992), Nortel is entitled to summary judgment with respect to her claim of unlawful termination.

## IV.  *CONCLUSION*

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned, that Nortel's motion for summary judgment (Docket No. 42) as to Yolanda Andujar be · ALLOWED as to her claim of wrongful discharge, but otherwise DENIED, and that the motion for summary judgment as to Veronica Gianferri be ALLOWED.[19]

September 30, 2005.

---

**19.**  The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998).